UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X

DENISE ANN GARCIA, as Administrator of the Estate of    Civil Action No.:
JAMES J. HEALY, JR., Deceased,                           11-CV-1466 (SHS) (LMS)

                                  *Plaintiff*,

    -against-

DUTCHESS COUNTY, DUTCHESS COUNTY SHERIFF'S
OFFICE and DEPUTY BENJAMIN SISTARENIK,

                                  *Defendants*.

------------------------------------------------------------------------X

## PLAINTIFF'S MEMORANDUM OF LAW
## IN OPPOSITION TO DEFENDANTS' MOTION
## FOR SUMMARY JUDGMENT

Gary Certain, Esq.
CERTAIN & ZILBERG, PLLC
*Attorneys for Plaintiff*
909 Third Avenue, 28th Floor
New York, New York 10022
Tel: (212) 687-7800

# TABLE OF CONTENTS

CASES.............................................................................................................PAGES

1. *Anderson v. Branen*, 17 F.3d 552 (2d Cir. 1994)................................................... 4
2. *Archer v. Dutcher*, 733 F.2d 14 (2d Cir. 1984).................................................... 16
3. *Breen v. Garrison*, 169 F.3d 152 (2d Cir. 1999)............................................... 4, 20
4. *Crowell v. Kirkpatrick*, 667 F.Supp.2d 391 (Dist. Ct., D. Vermont 2009)...................... 22
5. *Crowell v. Kirkpatrick*, 400 Fed. Appx. 592 (2d Cir. 2010)................................... 23
6. *Farmer v. Brennan*, 511 U.S. 825 (1970)...................................................... 16
7. *Fincher v. Depository Trust and Clearing Corp.*, 604 F.3d 712 (2d Cir. 2010)…....... .... ..3
8. *Gomez v. Pellicone*, 986 F.Supp. 220 (SDNY 1997)............................................. 3
9. *Graham v. Conner*, 490 U.S. 386 (1989)................................................. 3, 6, 7, 8
10. *Greenfield v. Tomaine*, 2011 WL 2714221 (SDNY 2011)...................... 4, 13, 14, 20, 21
11. *Hermes Int'l v. Lederer de Paris Fifth Ave., Inc.*, 219 F.3d 104 (2d Cir. 2000). .............. 3
12. *Heublein v. United States*, 996 F.2d 1455 (2d Cir. 1993)..................................... 3
13. *Hemphill v. Schott*, 141 F.3d 412 (2d Cir. 1998)........................................... 20
14. *Liscio v. Warren*, 901 F.2d 274 (2d Cir. 1990)…......................................... ..15
15. *Livingstone v. City of White Plains, N.Y.*, 2011 WL 7101234 (SDNY 2011)…......... ....20
16. *Matsushita Elec. Industr. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986)..................... 3
17. *Oliveria v. Mayer*, 23 F.3d 642 (2d Cir. 1994)............................................ 20
18. *Posr v. Doherty*, 944 F.2d 91 (2d Cir. 1991) ............................................ 14
19. *Quarantino v. Tiffany & Co.*, 71 F.3d 58 (2d Cir. 1995). ................................... 3
20. *Read v. Town of Suffern Police Dept.*, 2013 WL 3193413.................................. 21
21. *Saucier v. Katz*, 533 U.S. 194 (2001) .................................................. 16
22. *Scott v. United States*, 436 U.S. 128 (1978)…………………………………………….4
23. *Sullivan v. Gagnier*, 225 F.3d 161 (2d Cir. 2000) ......................................... 4
24. *Weather v. City of Mount Vernon*, 2011 WL 1046465 (SDNY 2011). ........................ 19
25. *Weyant v. Okst*, 101 F.3d 845 (2d Cir. 1996). ....................................... 15, 16

STATUTES.........................................................................................................PAGES

1. Federal Rule of Civil Procedure Rule 56……………………………………………………3

## PRELIMINARY STATEMENT

This memorandum of law is submitted in opposition to Defendants' motion for summary judgment and judgment on the pleadings.  The Court should deny Defendants' motion because issues of fact exist concerning whether Defendant Sistarenik's (hereinafter "Deputy Sistarenik") act of tasing Mr. Healy on the early morning of March 10, 2010 constituted excessive force, whether Deputy Sistarenik withheld medical care from Mr. Healy, and whether Deputy Sistarenik is entitled to qualified immunity.

## STATEMENT OF FACTS

On March 10, 2010, Virginia Scianna called a 911 emergency dispatcher to report that her boyfriend, James J. Healy, Jr. was acting strangely, was under the influence of cocaine and was "totally out of it"; Ms. Scianna further indicated that she believed he needed to go to the hospital.

The 911 dispatcher notified the New York State Troopers, who then sent State Troopers Greer, Miano, Shaw and Rose to respond to Virginia Scianna's Rhinebeck residence; in addition, Duchess County Deputy Sistarenik also responded to the call as a backup unit.  While en route to the home, radio and computer communications to the responding officers indicated that it was believed that Mr. Healy was under the influence of cocaine.

The primary officers, Troopers Miano and Greer, were the first to arrive. When  Troopers Miano and Greer approached and  attempted to speak with Mr. Healy in the kitchen of the home they observed that he was sweating profusely, pushing random buttons on a cordless telephone that he was holding in his hand and talking incoherently.  State Troopers Miano and Greer decided to take Mr. Healy into custody so that he could be taken to a hospital for treatment pursuant to N.Y. Mental Hygiene Law.  Troopers Rose and Shaw arrived around the

approximate time that State Troopers Miano and Greer decided that Mr. Healy needed to be taken to the hospital.

After being unable to effectively communicate with Mr. Healy, Troopers Miano and Greer advanced towards Mr. Healy and attempted to forcibly remove him from Ms. Scianna's residence.  A struggle soon ensued between Mr. Healy and Troopers Miano and Greer; Deputy Sistarenik and Troopers Rose and Shaw immediately joined the struggle in an attempt to restrain Mr. Healy.  Deputy Sistarenik, upon reaching Mr. Healy, without direction or instruction from the primary officers on the scene, immediately drew his taser and tased Mr. Healy twice in rapid succession for the maximum duration.  Shortly after being tased, Mr. Healy went into cardiac arrest and expired.  A material issue of fact exists as to whether or not the electric shocks introduced into Mr. Healy's body by Defendant Sistarenik's use of the taser caused Mr. Healy to suffer cardiac arrest.

After the struggle was over, Ms. Scianna noticed that Mr. Healy's back was no longer rising and falling, indicating Mr. Healy was no longer breathing.  Ms. Scianna quickly informed the officers present of Mr. Healy's condition, but the officers refused to respond accordingly. The officers ignored Ms. Scianna's entreaties for help and did not even bother to check Mr. Healy's condition for themselves.  It was only some time after, when a female trooper arrived at the scene, that the officers finally turned Mr. Healy over and saw that he was no longer breathing.  Even then, the officers refused to start mouth-to-mouth and instead waited to obtain a CPR mask before performing CPR.

Paramedics arrived and transported Mr. Healy to the hospital; Mr. Healy arrived at the hospital in full cardiac arrest and was pronounced dead shortly thereafter.

**LEGAL STANDARD**

Summary judgment shall be granted when there is "no genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of law."  Fed.R.Civ.P. Rule 56(a); *see also Hermes Int'l v. Lederer de Paris Fifth Ave., Inc.*, 219 F.3d 104, 107 (2d Cir. 2000). Summary judgment should not be granted on the basis of credibility assessments; that function is reserved for the trier of fact.  *Fincher v. Depository Trust and Clearing Corp.*, 604 F.3d 712, 725 (2d Cir. 2010).  Furthermore, even though the Court may not weigh the proffered evidence or assess the credibility of witnesses, *Gomez v. Pellicone*, 986 F.Supp. 220, 225 (SDNY 1997), the Court must resolve all ambiguities and draw all reasonable inferences in the light most favorable to the party opposing summary judgment.  *Quarantino v. Tiffany & Co.*, 71 F.3d 58, 64 (2d Cir. 1995). Summary judgment is appropriate only when "after drawing all reasonable inferences in favor of a non-movant, no reasonable trier of fact could find in favor of that party." *Heublein v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993), citing *Matsushita Elec. Industr. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

I.      **An issue of fact exists as to whether Deputy Sistarenik's use of the taser on Mr. Healy was reasonable.**

Plaintiff's first cause of action is for the use of excessive and unreasonable force in violation of Mr. Healy's Fourth Amendment rights.  "Claims that law enforcement officers have used excessive force – deadly or not – in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment 'reasonableness' standard."  *Graham v. Conner*, 490 U.S. 386, 395 (1989).  "The 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard

to their underlying intent or motivation." *Id.* at 397, *quoting Scott v. United States*, 436 US 128, 137-139 (1978).   Thus, "[a]n officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional." *Id.*

Claims of excessive force must be analyzed "under the totality of the circumstances, 'including the severity of the crime at issue, whether the suspect posed an immediate threat to the safety of others and whether he was actively resisting arrest.'" *Greenfield v. Tomaine*, 2011 WL 2714221 (SDNY 2011), *quoting Sullivan v. Gagnier*, 225 F.3d 161, 165 (2d Cir. 2000).   "The issue of excessive force [is]…for the jury, whose unique task [is] to determine the amount of force used, the injuries suffered, and the objective reasonableness of the officer's conduct." *Breen v. Garrison*, 169 F.3d 152, 153 (2d Cir. 1999), *citing Anderson v. Branen*, 17 F.3d 552, 558-559 (2d Cir. 1994) (Claims that law enforcement used excessive force must be put forth to a jury to decide whether the officers acted reasonably in light of the facts and circumstances of the situation they faced.)

In the case at bar, there are issues of fact as to whether or not Deputy Sistarenik's tasing of Mr. Healy was objectively reasonable considering the circumstances.   On the night of March 10, 2010, State Troopers Miano and Greer were the first officers to arrive at Ms. Scianna's residence; as the first responding officers, they were the primary individuals in charge of assessing and controlling the scene and deciding the proper course of action.[1]   Deputy Sistarenik, State Trooper Rose and State Trooper Shaw arrived shortly thereafter; State Troopers Rose and Shaw were back-up to State Troopers Miano and Greer, while Deputy Sistarenik was support to

---

[1] *See* Def. Mem. 2; *citing to* Deposition of Trooper Miano, dated October 23, 2012, 72-73, Defendants' Exhibit P; Deposition of Trooper Chaderik Greer, dated July 24, 2012, 48, Defendants' Exhibit Q; Deposition of Trooper Shaw, dated July 24, 2012, 25-26, Defendants' Exhibit R; Deposition of Trooper Craig Rose, dated October 23, 2012, 52-53, Defendant's Exhibit S; Deposition of Deputy Benjamin Sistarenik, dated November 27, 2012, 71-72, Defendant's Exhibit O.

the state troopers.[2]  By practice and protocol, Deputy Sistarenik was twice removed from any position of command in deciding how to handle the situation.

However, despite his lack of authority, Deputy Sistarenik made the decision to tase Mr. Healy without any confirmation or request from the state troopers.  Troopers Greer, Miano and Shaw all testified that they did not direct Deputy Sistarenik to use his taser.[3]  As further testament to the impropriety of Deputy Sistarenik's actions, Trooper Miano stated that he specifically wanted a warning from Deputy Sistarenik in the event a taser was used;  Trooper Miano states,

> "I said '[I]f you're gonna tase him, let me know so I can let go and he (Deputy Sistarenik) advised me he already did tase him….I had no – prior to that I had no knowledge of – my automatic assumption is…I thought if he tased him, me being attached to his arm and his body, I would feel the effects of it as well."[4]

And further,

> "Q: Did you get any warning from the deputy that he was going to use the taser before he used it?
> A: No.  Like I said, I asked him let me know if he did and he told me he already did.
> Q: Did he ask you as a primary officer whether or not he could use the taser before using it?
> A: Not that he asked me, no.
> Q: Did you see him ask any other troopers whether or not he could use the taser before using it?
> A: I would say no."[5]

It is clear that Deputy Sistarenik applied the taser to Mr. Healy rapidly, and executed two full taser cycle shocks within a minimal span of time without any direction or clearance from the state troopers.

Additionally, during the struggle, Trooper Miano was already in the course of attempting a wrist lock on Mr. Healy.[6]  The state troopers also communicated with each other to take Mr. Healy down to the floor.[7]  Thus, the state troopers, as the primary and secondary officers on the

---

[2] *Id.*
[3] *See* Miano 73-74; *see also* Greer 95:13-16; Shaw 57:23-25.
[4] *See* Miano 74:17-22.
[5] *Id.* at p 75.
[6] *See* Miano 77:1-4.
[7] *See* Greer 84:10-23, "I heard someone, I don't know if I said it or someone else said it, 'take him to the ground.'"

scene, were already coordinating with each other and in the process of applying other techniques calculated to subdue Mr. Healy.  Despite this, Deputy Sistarenik, as a tertiary support officer, decided on his own to deploy a taser on Mr. Healy not once, but twice, and without pausing to determine if the taser application was having the desired effect on Mr. Healy as recommended. Simply put, Deputy Sistarenik recklessly operated outside the proper chain of command when he arbitrarily decided to repeatedly tase Mr. Healy.

Defendants dubiously allege that Trooper Rose gave Deputy Sistarenik the command to use the taser.[8]  However, this contention is contradicted by the testimony of Trooper Miano, Trooper Greer as well as Deputy Sistarenik himself.  Troopers Miano and Greer both state that they were not even aware that a taser had been used until after the fact,[9] let alone hear an order given directing the use of a taser.  Trooper Miano's testimony specifically highlights his concern over the use of a taser, and his mistaken belief at the time that the use of the taser while he was still in contact with Mr. Healy would harm him as well.  It is highly improbable that a person who had such a distinct fear of the taser would not have heard or noticed another trooper ordering the use of the device.  Deputy Sistarenik explicitly states that none of the troopers instructed him to use the taser, nor did Deputy Sistarenik ask any of the troopers whether or not he should tase Mr. Healy.[10]

Trooper Shaw is the only trooper other than Rose who testifies that someone ordered Deputy Sistarenik to tase Mr. Healy.[11]  Although the officers' testimony is often inconsistent and contradictory, it appears that the tasing most likely occurred while Mr. Healy was lying on his

---

[8] *See* Def. Mem. 8-9, "Rose had told Sistarenik to use the taser as they were not getting control of Healy…" (*citing* Rose 83).
[9] *See* Miano 74; *see also* Greer 95-97.
[10] *See* Sistarenik 115:5-10.
[11] *See* Shaw 58:2-4.

stomach on the ground; Trooper Shaw states that he was holding onto Mr. Healy's left hand[12] and Deputy Sistarenik was on the right side of Mr. Healy, opposite of Trooper Shaw.[13]  Deputy Sistarenik applied his taser to Mr. Healy's right thigh.[14]  Trooper Miano states that when Mr. Healy was on the ground, he was positioned on Mr. Healy's right side trying to gain control of Mr. Healy's right arm to cuff his right hand.[15]  Trooper Rose states that he was controlling Mr. Healy's right leg.[16]  Trooper Greer states that during the struggle, he was hugging one of Mr. Healy's thighs with both his hands.[17]  Since Trooper Rose was already grabbing Mr. Healy's right thigh, the only logical conclusion for Trooper Greer is to be positioned at Mr. Healy's left thigh, in between Trooper Rose and Trooper Shaw.  Despite being much closer to Trooper Rose, Trooper Greer testifies that that he was not aware of a taser being used, and further, does not even remember when he learned of the taser use.[18]  It is simply unbelievable that the two officers closest to Trooper Rose, Trooper Greer and Deputy Sistarenik, did not hear Trooper Rose's alleged order to use a taser, but Trooper Shaw, who was further away, did.

Trooper Rose's claim that he ordered Deputy Sistarenik to use the taser is simply not believable.  Furthermore, even if a command was given, Trooper Rose stated that the command was only limited to the first tasing.  Trooper Rose states that he did not command Deputy Sistarenik to tase Mr. Healy a second time; indeed, Trooper Rose states that he wasn't even aware that the taser had been used a second time.[19]

Thus, even assuming Deputy Sistarenik's first tasing of Mr. Healy was proper, there is a material issue of fact as to whether Deputy Sistarenik's second tasing of Mr. Healy was

---

[12] *See* Shaw 58:9-12.
[13] *See* Shaw 57:4-8.
[14] *See* Dutchess County Autopsy Report, Defendants' Exhibit E.
[15] *See* Miano 61-66.
[16] *See* Rose 79.
[17] *See* Greer 79-80.
[18] *See* Greer 95-96.
[19] *See* Rose 93:4-21.

objectively reasonable.  The testimony of State Troopers Miano, Greer, Rose and Shaw and Deputy Sistarenik each paint a different picture of the events on the night/early morning of March 10, 2010.  Despite their status as trained observers their testimony is inconsistent, conflicting and in part improbable.  For example, Trooper Rose states that the physical confrontation began when Mr. Healy attempted to swing at Trooper Miano, and that he, Trooper Shaw and Trooper Greer immediately engaged Mr. Healy in an attempt to control and subdue Mr. Healy.[20]  However, Deputy Sistarenik testified that the struggle with Mr. Healy began when he attempted to exit the kitchen, and that the troopers moved to block the door preventing Mr. Healy from leaving the kitchen; Mr. Healy, who was already in motion, walked into a trooper and a struggle ensued.[21]  Deputy Sistarenik further testified that Mr. Healy's arms were not extended, thus indicating that Mr. Healy did not attempt to swing at or punch Trooper Miano.[22]

Trooper Rose also testified that it took nearly a minute to bring Mr. Healy to the ground;[23] Trooper Miano states that the whole struggle lasted approximately three to four minutes.[24]  However, Troopers Greer and Shaw state that all five officers were struggling with Mr. Healy and that together the officers took Mr. Healy down to the floor within seconds.[25]  In yet another discrepancy, Deputy Sistarenik describes the initial struggle as taking place only between Mr. Healy, Trooper Greer and Trooper Miano, and that those three fell to the ground together; according to Deputy Sistarenik's account of the events, Trooper Rose and Trooper Shaw only joined the struggle after Mr. Healy was already down on the ground.[26]

---

[20] *See* Rose 57:22-25.
[21] *See* Sistarenik 99-100.
[22] *See* Sistarenik 100:20-21.
[23] *See* Rose 63:8-16.
[24] *See* Miano 82-83.
[25] *See* Greer 83-85; *see also* Shaw 48:10-14.
[26] *See* Sistarenik 104-105.

Additionally, there are discrepancies concerning Mr. Healy's alleged kicking of Trooper Rose; Deputy Sistarenik cites the kicking of Trooper Rose as a prominent reason for why he decided to deploy the taser. Deputy Sistarenik testified that he tased Mr. Healy "as soon as he kicked Trooper Rose," and that the tasing was in reaction to seeing Mr. Healy kick Trooper Rose.[27] However, Deputy Sistarenik described the kick as Mr. Healy being on his back on the ground, rolling to his side and mule kicking Trooper Rose with both feet,[28] whereas Trooper Rose testified that he was kicked while Mr. Healy was still standing, and that Mr. Healy only kicked with one leg.[29] Additionally, Deputy Sistarenik and Trooper Rose are the only individuals who testified that Mr. Healy kicked Trooper Rose; the depositions of Troopers Miano, Greer and Shaw are devoid of any mention of any such kick. This coincidence is disturbing considering that Trooper Rose stated in a sworn deposition that he ordered Deputy Sistarenik to use the taser, while Deputy Sistarenik admitted that no one commanded him to use the taser. Respectfully, a trier of fact could reasonably find that Trooper Rose and Deputy Sistarenik exaggerated and/or even fabricated the entire kick as a false justification for Deputy Sistarenik's use of the taser.

The dissimilarity in the testimony of the state troopers and Deputy Sistarenik signifies a disturbing lack of credibility and/or reliability as to the events that occurred on the night/early morning of March 10, 2010. There are material issues of fact to be resolved surrounding how long the struggle lasted, how quickly Mr. Healy was taken to the ground, whether Trooper Rose was ever kicked by Mr. Healy, how long it took the officers to gain control of Mr. Healy after he was on the ground and whether or not Mr. Healy was even struggling after he was brought down to the ground. There are also inconsistencies as to how soon Deputy Sistarenik deployed his

---

[27] *See* Sistarenik 112:4-13.
[28] *See* Sistarenik 106:12-25.
[29] *See* Rose 74-75.

taser, whether the taser was deployed when Mr. Healy was still standing or on the ground, and whether the second tasing was improperly applied to Mr. Healy when he was already on the ground, subdued and in control of the officers.  With all these conflicting versions of events, it is improper for Plaintiff's excessive force claim to be determined via summary judgment motion; respectfully, the Court should deny Defendants' motion and allow a jury to decide whether or not Deputy Sistarenik acted reasonably when he tased Mr. Healy twice in rapid succession.

Furthermore, Plaintiff's Training, Police Procedure and Use of Force expert, Charles Drago, writes in his report that Deputy Sistarenik failed, among other things, to give Mr. Healy time to comply with the officers' commands after the initial taser shock.  Mr. Drago is a former State of Florida law enforcement officer who rose from the rank of patrol officer to Police Chief and who earned forty police department and public commendations for exemplary service.  Prior to his promotion to Police Chief, Mr. Drago served as Commander of the Field Training Officers Program.  Mr. Drago also served as a former police instructor and was part of the FDLE/Florida Commission on Standards and Training; as an instructor, Mr. Drago has provided training to thousands of police officers concerning a variety of police procedures, including on the use of force and use of tasers.  Mr. Drago was also a guest instructor at Valencia College, teaching courses on police practices and procedure, including on managing the use of force.

According to Mr. Drago, properly trained officers must consider the totality of the circumstances when any force is used.  Concerning the use of tasers, officers are trained to take into consideration the individual's physical condition, any influence of drugs, physical exertion, physical stress, symptoms of excited delirium, pregnancy and any other medical conditions.[30] Once the decision to deploy a taser has been reached, the tasing officer should clearly announce his intent to use the taser so that the suspect has notice as well as an opportunity to comply with

---

[30] *See* Plaintiff's Expert Charles Drago's Report, Defendants' Exhibit I, p 5-6.

the officer's commands.  A clear announcement also serves to ensure that the other officers are aware of the impending use of the taser so that the other officers can coordinate and attempt to subdue and restrain the individual at the same time as the taser's application.[31]   After the application of the taser, the situation is once again assessed and the suspect must be given an opportunity to comply before any further tasings.[32]   Each subsequent tasing must follow the same protocol: an announcement giving due notice, a pause allowing the suspect an opportunity to comply, and then the actual tasing.

In the present case, Deputy Sistarenik was informed by the radio dispatcher that Mr. Healy was possibly under the influence of cocaine.[33]   At the residence, Deputy Sistarenik heard Mr. Healy talking in incoherent mumbles, randomly hitting buttons on a cordless telephone, and making vague references to money and knives.[34]   The Dutchess County autopsy report describes Mr. Healy as "morbidly obese."[35] Furthermore, at the time of the tasing, Mr. Healy was in the midst of an intense struggle with four state troopers.   A reasonable officer should have considered whether tasing a Mr. Healy could exacerbate his physical condition and/or cause irreparable harm.   Under these circumstances, there is a material issue as to whether Deputy Sistarenik's decision to tase Mr. Healy was proper in light of Mr. Healy's obvious morbid obesity, the cocaine in Mr. Healy's system, his hallucinating and erratic behavior, and the physical struggle with four state troopers, all of which constitute a risk factor for cardiac arrest from taser use.

Deputy Sistarenik also deviated from proper police procedure by failing to announce his deployment of the taser.  Deputy Sistarenik testified that none of the state troopers gave him the

---

[31] *See* Drago's Report, p 11.
[32] *See* Drago's Report, p 11.
[33] *See* Sistarenik 72.
[34] *See* Sistarenik 86-88.
[35] *See* Dutchess County Autopsy Report, p2, Defendants' Exhibit E.

order to tase Mr. Healy, nor did Deputy Sistarenik warn the state troopers when he tased Mr. Healy.  Additionally, Deputy Sistarenik waited only two seconds before applying the taser a second time to Mr. Healy.  Deputy Sisatrenik's silence denied both Mr. Healy an opportunity to comply with the officers' commands as well as ruining any chance of coordination between the other officers, thereby nullifying the purpose of tasing Mr. Healy.

Mr. Drago states that Deputy Sistarenik inappropriately applied the taser a second time within a mere two seconds of the first tasing.  Police officers must wait between applications of the taser to determine if the device is having an appropriate effect.[36]  Even Taser International, the manufacturer of the TASER Model X-26 device, has issued warnings against multiple applications of the taser, and advises officers to reassess a subject's resistance level before initiating or continuing the taser shock.[37]  Deputy Sistarenik failed to do any of those things; instead, Deputy Sistarenik simply jumped on Mr. Healy while he already had four state troopers on him and repeatedly tased Mr. Healy within a span of mere seconds.

Furthermore, Mr. Drago states that Deputy Sistarenik's second tasing was unnecessary because at that point the officers were already successfully controlling and very close to putting restraints on Mr. Healy.[38]  As stated in Trooper Shaw's testimony, the taser was used towards the end of the struggle when Mr. Healy was already on the ground and held down by the other officers.[39]  Thus, not only did Deputy Sistarenik fail to properly wait between the multiple applications of the taser, but applied a second tasing to a man who was already under control and had clearly exhibited a number of risk factors that suggested taser use would be inappropriate and potentially lethal.

---

[36] *See* Drago Report, p 10.
[37] *See* Drago Report, p 10.
[38] *See* Drago Report, p 12-13.
[39] *See* Shaw 59:6-11.

The *Greenfield* case is especially instructive; in *Greenfield*, the plaintiff had a verbal altercation with his aunt, leading to police arriving at their home to investigate the situation.  By the time the police officers arrived at the house, they found the plaintiff in the basement brandishing a knife.  When plaintiff refused defendant's commands to drop the knife, defendant shot plaintiff with a taser, causing plaintiff to drop the knife and shake for a few minutes before falling to the ground.  The parties disputed whether or not plaintiff continued to struggle after the initial tasing, but it is undisputed that the defendant tased plaintiff a second time within moments after the initial tasing.

The plaintiff brought a claim pursuant to 42 U.S.C. §1983 for, among others, excessive force; the defendant moved for summary judgment dismissing the claim on grounds that his conduct was reasonable, and also that he was protected from liability due to qualified immunity. The District Court granted defendant's motion for summary judgment with respect to the initial tasing, but denied defendant's motion for summary judgment with respect to the second tasing. In coming to its decision, the District Court held that when the taser was applied for a second time, there remained an issue of fact as to whether plaintiff was still struggling, how long the struggle lasted and whether plaintiff's "struggle" was merely an adverse affect to the taser shock. *Greenfield*, at 4.  Additionally, the District Court noted that by the time of the second tasing, plaintiff was already on the ground, and the officers had already secured the knife.

Mr. Healy's situation is analogous to *Greenfield*; Mr. Healy was under the influence of cocaine and had already been shocked once when Deputy Sistarenik applied the taser a second time.  Coupled with the fact that Mr. Healy was underneath a writhing mass of four other police officers, it is impossible to say with certainty whether or not Mr. Healy was still struggling by

the time of the second tasing, or whether Mr. Healy's apparent "struggle" was caused by the first taser shock or simply by the random pushing and pulling of the state troopers.

Additionally, when Deputy Sistarenik deployed the taser for a second time, Mr. Healy was already on the ground face down and under the control of the state troopers. Just like the plaintiff in *Greenfield* whose knife was secured by the officers, Mr. Healy posed no potential threat to himself or anyone else. Thus, it cannot be said that Deputy Sistarenik's second application of the taser was objectively reasonable. At the very least, this is a question of fact that is more appropriately left for a jury to decide.

**II.    Since a material issue of fact exists as to whether Deputy Sistarenik's second application of the taser was objectively reasonable, a material issue of fact exists as to whether Deputy Sistarenik committed battery and assault on Mr. Healy**.

A claim for battery and assault against law enforcement personal parallels the Fourth Amendment standard for excessive force, and as such, has identical elements. *Posr v. Doherty*, 944 F.2d 91, 94 (2d Cir. 1991) (Stating that the essential elements for a § 1983 claim for excessive force and state law assault and battery are substantially identical.)

As discussed at length in Section I, *supra*, a material issue of fact exists as to whether Deputy Sistarenik's second application of the taser shock was excessive. Since the elements for a state law claim of assault and battery are identical to the elements for a § 1983 claim for excessive force, it logically follows that a material issue of fact also exists as to whether Deputy Sistarenik committed assault and/or battery on Mr. Healy. Thus, the Court should deny Defendants' motion for summary judgment seeking to dismiss Plaintiff's state law assault and battery claims.

**III.    Since a material issue of fact exists as to whether Deputy Sistarenik's second application of the taser was objectively reasonable, a material issue of fact also exists as to whether Deputy Sistarenik is responsible for the wrongful death of Mr. Healy.**

As discussed in Section I and II, *supra*, a material issue of fact exists as to whether Deputy Sistarenik's second application of the taser shock was excessive.  Since a material issue of fact exists as to whether Deputy Sistarenik's second application of the taser shock was excessive, it logically follows that a material fact also exists as to whether Deputy Sistarenik is responsible for the wrongful death of Mr. Healy.

**IV.    An issue of fact exists as to whether Deputy Sistarenik denied Mr. Healy medical treatment.**

Defendants' request for summary judgment dismissing Plaintiff's claim that Deputy Sistarenik denied Mr. Healy medical treatment is improper because there exist issues of material fact concerning how quickly the officers contacted medical personnel and/or initiated CPR procedures.

Claims for denial of medical care in relation to convicted prisoners are viewed through the Eighth Amendment; for persons who have not been convicted, and thus are considered pre-trial detainees, claims for denial of medical care are analyzed under the Due Process Clause.  A custodian of a pretrial detainee "may be found liable for violating the detainee's due process rights if the official denied treatment needed to remedy a serious medical condition and did so because of his deliberate indifference to that need." *Weyant v. Okst*, 101 F.3d 845, 856 (2d Cir. 1996), *citing Liscio v. Warren*, 901 F.2d 274, 276-277 (2 Cir. 1990).   "Deliberate indifference…may be shown by evidence that the official acted with reckless disregard for the

substantial risk posed by the detainee's serious medical condition." *Weyant*, *citing Farmer v. Brennan*, 511 U.S. 825, 836 ("[A]cting or failing to act with deliberate indifference to the substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding that risk.")

In the Second Circuit, the official's conduct is held to an objective standard, requiring determination as to whether the official knew or should have known of the risk to the person's health or safety. *Weyant* at 856, *citing* to *Liscio*, at 276-277. Additionally, "the state of the defendant's knowledge is normally a question of fact to be determined after trial." *Id.*, *citing Archer v. Dutcher*, 733 F.2d 14, 17 (2d. Cir. 1984).

In the present case, an issue of fact exists as to whether Deputy Sistarenik recklessly waited and failed to act in either performing CPR himself and/or failing to notify paramedics after Mr. Healy went into cardiac arrest. At her deposition, Virginia Scianna testified that after Mr. Healy had been handcuffed, she noticed that he was no longer breathing. When Ms. Scianna informed Deputy Sistarenik (and the other officers) of Mr. Healy's unconsciousness, Deputy Sistarenik ignored Mr. Healy's plight. Ms. Scianna testifies in her deposition,

> "I looked at his (Mr. Healy's) back, I looked to see for rising and falling. And I didn't see it. And I stated, 'He's not breathing.' One of the officers said, 'He is all right; he is just tuckered out.' I kept staring at his back. And I saw, No, he is not breathing."[40]

Despite being informed of Mr. Healy's condition by Ms. Scianna, the officers present at the scene, Deputy Sistarenik included, simply stood around. Their inaction lasted until another female trooper arrived at the scene; Ms. Scianna testifies,

> "Q: At some point, did additional law enforcement arrive?
> A: The female trooper did.
> Q: When she arrived, what was happening in the kitchen?
> A: What was happening was they were – they listened to what I said. And one of the officers said, Oh shit; he is not breathing; turn him over on his back. They unrestrained him, turned him over on his back, and that's when he was blue. **Everybody was standing around, looking down at him.**

---

[40] *See* Deposition of Virginia Scianna, dated July 11, 2012, 72, Defendants' Exhibit T.

> **And I said, Isn't anybody going to do CPR?  I heard one of the troopers say, I don't have my mask with me.**"[41] (emphasis added.)

The testimony of Ms. Scianna clearly shows that Deputy Sistarenik, after being informed of Mr. Healy's unconsciousness, refused to act or intervene in any way.  Deputy Sistarenik ignored Ms. Scianna's warnings that Mr. Healy was no longer breathing for an indeterminate amount of time.  It was only after another female trooper arrived on the scene that any action was taken.  However, even then, the officers continued to disregard Mr. Healy's condition, going so far as to use the lack of a mask as an excuse not to engage in life rescuing CPR procedures.  Respectfully, Deputy Sistarenik should have started life-saving procedures immediately upon being informed of Mr. Healy's distress by Ms. Scianna.  In fact, as the officer who tased Mr. Healy, Deputy Sistarenik should have been personally closely monitoring Mr. Healy for any adverse reaction or complication to the tasing.  Deputy Sistarenik's refusal to engage in CPR due to lacking a mask is an improper excuse in light of the grave situation, along with the his blatantly ignoring Ms. Scianna's warnings, may serve as a basis for a jury to conclude that such a failure constituted reckless disregard for Mr. Healy's health and safety.

In their memorandum of law, Defendants attempt to portray Deputy Sistarenik as a hero by claiming that Deputy Sistarenik "immediately provided first aid to Healy through CPR."[42]  However, Ms. Scianna testified that none of the officers, Deputy Sistarenik included, made any timely effort to perform CPR on Mr. Healy.[43]  Indeed, Ms. Scianna even expressed shock that none of the officers were performing mouth-to-mouth.[44]  Defendants' claim relies only on the disputed testimony of Troopers Shaw, Miano, Rose and Greer, Deputy Sistarenik and the paramedics that arrived on the scene later in the early morning.  However, the state troopers' and

---

[41] *See* Scianna 74.
[42] Def. Mem. 18.
[43] *See* Scianna 76:12-16, 91:10.
[44] *Id.*

Deputy Sistarenik's testimony concerning what happened after Mr. Healy was in custody is just as conflicted as their testimony concerning the events of the struggle. Trooper Miano states that Mr. Healy was already standing up when Trooper Miano noticed that Mr. Healy was blue.[45] However, Trooper Shaw testified that Mr. Healy was still on the ground when Ms. Scianna informed the officers that Mr. Healy was no longer breathing, and that the he and Trooper Greer went to pick Mr. Healy off the ground.[46] In another contradiction, Trooper Greer testified that after Mr. Scianna informed them that Mr. Healy was no longer breathing, all four state troopers assisted in lifting Mr. Healy off the ground.[47] Trooper Rose testified that immediately after Mr. Scianna informed the officers that Mr. Healy was no longer breathing, Mr. Healy was uncuffed and CPR procedures were initiated.[48]

The lack of consistency in the state troopers' and Deputy Sistarenik's testimony represents a disturbing lack of credibility and reliability. As Sistarenik, Miano, Greer, Rose and Shaw are all law enforcement members, who share a well known camaraderie and the bonds of the law enforcement brotherhood, finders of facts may determine, particularly given the inconsistent accounts they have provided, that the officers may have fabricated, embellished, warped and/or simply lied regarding the events of the subject incident. Considering the significant inconsistencies and credibility issues as to all of the officers' testimony, it is absolutely inappropriate for Defendants to rely on the officers' accounts as a basis for a summary judgment motion.

Defendants' reliance on the testimony of the paramedics are also flawed because the paramedics do not have the proper factual basis to testify concerning whether or not the officers

---

[45] *See* Miano 85:12-17.
[46] *See* Shaw 53:11-18.
[47] *See* Greer 90:9-19.
[48] *See* Rose 82:11-16.

engaged in providing Mr. Healy with timely and proper medical care at any point prior to their arrival. The paramedics arrived at the scene only after Mr. Healy had been blue and unconscious; as such, the paramedics have no way of knowing exactly how much time had passed before the officers actually engaged in CPR in an attempt to resuscitate Mr. Healy. The only testimony available concerning the events during the period of time between Mr. Healy becoming unconscious and until the paramedics arrived are the conflicting versions found within the testimony of the officers and Ms. Scianna; the credibility of the officers' testimony have already been previously discussed at length. Ms. Scianna, as a non-party witness in this action, has no interest in this action and testified consistently and credibly. Ms. Scianna clearly states that she informed Deputy Sistarenik that Mr. Healy was not breathing; Deputy Sistarenik ignored her warnings, and even after Mr. Healy was turned over Deputy Sistarenik still failed to engage in life saving CPR procedures. In the light most favorable to the nonmoving party, this Court should credit Ms. Scianna's account as accurate. Respectfully, the Court should deny Defendants' motion for summary judgment and allow a jury to determine whether Deputy Sistarenik's conduct constituted denial of medical care.

**V.  An issue of fact exists as to whether Deputy Sistarenik should be granted Qualified Immunity.**

Qualified Immunity is analyzed through a two-step process: 1) whether the officer violated a Constitutional Right, and if so, 2) whether the right was clearly established. "The relevant inquiry is 'whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *Weather v. City of Mount Vernon*, 2011 WL 1046465 (SDNY 2011), *quoting Saucier v. Katz*, 533 US 194, 202 (2001).

Summary judgment based on qualified immunity "requires that no dispute about material factual issues remain." *Hemphill v. Schott*, 141 F.3d 412, 418 (2d Cir. 1998). S*ee also Breen* at 153 ("The parties' versions of the material facts differ markedly…[t]hese differences also preclude summary judgment on the defense of qualified immunity."); *Greenfield* at 6 ("Because genuine issues of material fact exist regarding Plaintiff's claim, genuine issues of material fact also preclude determination of qualified immunity on the present Motion."); *Oliveria v. Mayer*, 23 F.3d 642, 649 (2d Cir. 1994) (Although immunity "ordinarily should be decided by the court, that is true only in those cases where the facts concerning the availability of the defense are undisputed; otherwise, jury consideration is normally required."); *Livingstone v. City of White Plains, N.Y.,* 2011 WL 7101234, at 4 (SDNY 2011) ("The Court cannot conclude that Fottrell is protected by qualified immunity because disputed issues of fact prevent the Court from evaluating whether his actions were objectively reasonable.")

In the current case, as discussed in Section I and II, *supra*, there remain numerous material issues of fact concerning whether the successive applications of the taser by Deputy Sistarenik were reasonable. Additionally, there are material issues of fact concerning whether Deputy Sistarenik denied medical care to Mr. Healy after he became unconscious.

Defendants claim that "neither the United States Supreme Court nor the Second Circuit have ever recognized that the Fourth Amendment protects a resisting subject from being stun tased by law enforcement officials making an authorized arrest,"[49] and then use this statement as a spring board to state that Deputy Sistarenik's tasing of Mr. Healy did not violate the Fourth Amendment.[50] Defendants then cite to a string of cases *from other outside circuits* where

---

[49] Def. Mem. 32.
[50] Def. Mem. 33.

officers were granted qualified immunity after tasing a suspect under a variety of disparate circumstances.

Defendants' arguments are both unpersuasive and misleading; first, Defendants' outrageous representation that there is no precedent for the Fourth Amendment protecting individuals from being tased by law enforcement making an authorized arrest is patently false. There are a multitude of cases where courts have held that the Fourth Amendment offers protection against tasing even during a lawful arrest where the act of tasing was objectively unreasonable. *See Greenfield; see also Read v. Town of Suffern Police Dept.*, 2013 WL 3193413 (SDNY 2013).

Second, turning to the substance of *Crowell*, even the most cursory review reveals that *Crowell* is factually distinct from the case at bar.  In *Crowell*, the plaintiffs were two members of a group of protestors trespassing on private property under the mistaken belief that there was an impending commercial development.  When the police initially arrived, they informed the protestors, a group that included the plaintiffs, of their mistake, and gave the protestors a chance to vacate the premises voluntarily.  The officers then left the premises and returned at a later time to see if any protestors had accepted the offer to voluntarily vacate the premises; this occurred multiple times, with each time the officers giving the protestors a chance to leave and returning at a later time to see if any protestors remained.  On the last occasion the officers returned, nearly a day after the protests began, the only protestors remaining were the two plaintiffs, who had chained themselves to a 300-lb. barrel and refused to free themselves.  The officers again attempted to verbally persuade the plaintiffs to voluntary undo the locks on the chains and exit the premises; the plaintiffs refused.  When one of the plaintiffs signaled for more protestors to return to the site, the officers decided to use tasers as a way to force compliance.  The officers

21

informed the plaintiffs that they were about to be tased, and only after the plaintiffs' continued refusal to unlock the chains tased both plaintiffs two to three times each, with a pause between each application to request the plaintiffs end the protest. After the third taser application, the plaintiffs undid the locks chaining themselves to the barrel, were arrested and removed from the premises. *Crowell v. Kirkpatrick*, 667 F.Supp.2d 391, 398-399 (Dist. Ct., D. Vermont 2009)

The District Court, in coming to the conclusion that the officers' tasing of the plaintiffs did not violate a Fourth Amendment protected right, focused on a variety of factors: that the officers gave the plaintiffs multiple opportunities to voluntarily leave the premises; that the barrel the plaintiffs were chained to was structurally unfamiliar to the officers, and thus the officers could not dismantle the barrel as a way of freeing the plaintiffs; that one of the plaintiffs had signaled for more protestors to return; that the officers attempted verbal persuasion before resorting to using the taser; that the officers informed the plaintiffs of each application of the taser, and the officers waited between each application to give the plaintiffs a chance to change their minds. *Crowell v. Kirkpatrick*, 667 F.Supp.2d 391, 408 (Dist. Ct., D. Vermont 2009)

The facts in *Crowell* are significantly distinct from the facts of the current case; the officers in *Crowell* attempted multiple alternate methods of persuasion before resorting to Taser use; there were no reported health risks to the *Crowell* plaintiffs that suggested taser use might have been imprudent if not dangerous; the officers in *Crowell* informed the plaintiffs when they were about to use the taser; and the officers in *Crowell* paused before each application of the taser to see if plaintiffs would comply with the officers' commands. Deputy Sistarenik did none of these things before tasing Mr. Healy twice in rapid succession. Respectfully, *Crowell*'s facts are simply too dissimilar to be of any analytical use to the current action. In fact, the District Court in *Crowell* states as much,

> "[H]ad the Defendants immediately tased the Plaintiffs without first asking them to leave, **and without providing any opportunity to comply**, then the Plaintiffs would have a stronger Fourth Amendment Claim." *Id.* at 408-409. (emphasis added)

Further, Defendants improperly stated to this court that *Crowell* stands for the premise that all taser use to effect an arrest does not violate the Fourth Amendment; when in fact the *Crowell* Court specifically analyzed the list of factors mentioned above shows that the court's decision is only relevant to cases with substantially similar facts.   Indeed, the District Court states,

> "[T]the Court agrees with the Defendants and…other courts that using a Taser as a **last resort to effect the arrests of suspects who are resisting, who have repeatedly been given lawful orders with which they could have easily complied, and who received repeated warnings specifically about the use of pain compliance techniques, is not unreasonable, and does not rise to the level of a Fourth Amendment violation."** *Id.* at 409 (emphasis added).

It is unfathomable that Defendants could have reached the conclusion that the District Court's decision in *Crowell*, replete with fact specific conditions, could stand for the broad premise that all taser use in furtherance of affecting an arrest, as a rule, does not violate the Fourth Amendment.

In fact the Second Circuit specifically held "that the use of force in **these particular circumstances** was objectively reasonable." *Crowell v. Kirkpatrick*, 400 Fed. Appx. 592, at 594. (emphasis added).  It was only because the officers' conduct was objectively reasonable that the Second Circuit affirmed the District Court's ruling; the Second Circuit did not even proceed to the question as to whether or not tasing an individual resisting arrest violates the Fourth Amendment as a matter of law.  The Second Circuit specifically states,

> "While **we do not suggest that the use of a taser to effect arrest is always, or even often, objectively reasonable**, under the circumstances here, even construing the facts in the light most favorable to Plaintiffs, we conclude that it was." *Id.* at 595. (emphasis added).

Thus, not only do the Defendants grossly misinterpret and misapply the District Court decision in *Crowell*, but Defendants proceed to project their flawed analysis onto the Second

Circuit's affirming of the District Court's very narrow and fact specific holding.  It is clear that Defendants are mistaken concerning the law on taser use to effect an arrest in the Second Circuit. A proper analysis of the law shows that there is no such precedent in the Second Circuit that holds that taser use to effect an arrest, under all circumstances, is constitutional as a matter of law.  Plaintiff respectfully urges the Court to reject the Defense theory of qualified immunity and deny Defendants' motion for summary judgment on the basis of qualified immunity.

**VI.     Plaintiff concedes that her claim for false arrest should be dismissed.**

Plaintiff concedes that her claim against Defendants for false arrest should be dismissed.

**VII.    Plaintiff concedes that her claim against Dutchess County for Negligent Hiring, Training and Supervision should be dismissed.**

Plaintiff concedes that her state law claim against Dutchess County for Negligent Hiring, Training and Supervision should be dismissed.  However, the essence of said claim remains to the extent that it is encompassed by the doctrine of respondeat superior given that Deputy Sistarenik was acting as an employee and agent of Dutchess County within the scope of his employment.

## CONCLUSION

Defendants' motion for summary judgment should be denied with respect to Plaintiff's excessive force, assault, battery, and denial of medical care claims.  Deputy Sistarenik should not be granted qualified immunity because material issues of fact exist concerning his use of a TASER Model X-26 on Mr. Healy and whether or not he denied Mr. Healy medical treatment. Plaintiff concedes and withdraws her claims for false arrest and negligent hiring, training and supervision should be dismissed.

Dated: New York, New York
      July 22, 2013

Respectfully submitted,

Gary Certain [GC-7509]