USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 8/21/14

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DENISE ANN GARCIA, as Administrator
of the Estate of JAMES J. HEALY, JR.,
Deceased,

       Plaintiff,

  -against-

DUTCHESS COUNTY, DUTCHESS
COUNTY SHERIFF'S OFFICE, and
DEPUTY BENJAMIN SISTARENIK,

       Defendants.

11-Cv-1466 (SHS)

OPINION & ORDER

SIDNEY H. STEIN, U.S. District Judge.

## I. INTRODUCTION

Denise Ann Garcia brings this action as administrator of the estate of
James J. Healy, Jr., the deceased father of her children K.A. and C.L.
Garcia asserts claims pursuant to 42 U.S.C. § 1983 and New York state law
against Dutchess County and the Dutchess County Sheriff's Office
(collectively the "County defendants"), and Dutchess County Deputy
Sheriff Benjamin Sistarenik.[1] Plaintiff's action arises out of the events on
the early morning of March 10, 2010, culminating in Healy's death after
Sistarenik fired a taser at Healy twice in short succession during a struggle
between Healy and several law enforcement officers.

---

[1] Six additional defendants were also sued by Garcia, but the parties
stipulated to the dismissal of those defendants. (See Order & Partial
Stipulation of Discontinuance & Dismissal dated May 21, 2013 (Dkt. No. 32).)

Now before the Court is defendants' motion for summary judgment in their favor pursuant to Federal Rule of Civil Procedure 56(c).[2] The relevant remaining claims are against defendant Sistarenik: (1) pursuant to section 1983 for excessive force in violation of the Fourth Amendment of the U.S. Constitution and for failure to provide medical care in violation of the Due Process Clause of the Fourteenth Amendment; and (2) pursuant to New York state law for assault, battery, and wrongful death. Plaintiff also seeks to hold the County defendants vicariously liable on the state law claims.[3]

Material factual disputes preclude those claims from being resolved on a motion for summary judgment. When all factual inferences are drawn in plaintiff's favor, a jury could reasonably conclude that Sistarenik used excessive force against Healy, and therefore committed assault and battery. In short, factual disputes abound regarding whether Healy posed a threat to officer safety, whether Healy was resisting arrest when tased, whether the other officers had already restrained Healy when Sistarenik used the taser, and whether Sistarenik warned Healy before using the taser. These disputed facts all bear on the totality of circumstances relevant to whether Sistarenik's use of the taser constituted excessive force. On this record, a jury could also reasonably conclude that Sistarenik delayed obtaining medical care for Healy once Healy's girlfriend alerted Sistarenik and the other officers that Healy was not breathing. For similar reasons,

---

[2] The County defendants also moved for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c) on plaintiff's claim against them for negligent hiring, training and supervision. Plaintiff has conceded that judgment in defendants' favor is appropriate on that claim and that her claim for false arrest against all defendants should also be dismissed. (*See* Pl.'s Mem. of Law in Opp. to Defs.' Mot. for Summ. J. 24 (Dkt. No. 42).)

[3] Plaintiff does not contend that the County defendants are liable on the federal constitutional claims pursuant to the doctrine of *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978) or otherwise.

Sistarenik has not met his burden at this juncture of showing that he is entitled to qualified immunity on plaintiff's section 1983 claims. Moreover, a jury could reasonably determine based on the autopsy report and other record evidence that firing the taser was a significant factor contributing to Healy's death and that defendants are therefore liable on plaintiff's wrongful death claim.

Accordingly, the Court denies defendants' motion for summary judgment. The Court also dismisses the Dutchess County Sheriff's Office as a defendant because that entity is not amenable to suit.

## II. BACKGROUND

The parties sharply dispute the underlying facts. The following summary presents the evidence in the light most favorable to plaintiff, the non-moving party. *See Giannullo v. City of N.Y.*, 322 F.3d 139, 140–41 (2d Cir. 2003).

At approximately 1:30 a.m. on the morning of March 10, 2010, Virginia Scianna called 911 to request assistance because she was concerned for the health and safety of Healy, with whom she lived in Rhinebeck, New York. (Defs.' Local Civil Rule 56.1 Statement of Undisputed Facts ("Defs.' 56.1") ¶ 7; Dep. of Virginia Scianna dated July 11, 2012, at 27:4–10, 33:3–4, Ex. T to Aff. of David L. Posner dated June 21, 2013.) Scianna told the 911 operator that she believed Healy may have been under the influence of cocaine; that he was ranting to himself; and that he was running back and forth from one end of the house to the other. (Defs.' 56.1 ¶ 9–10.) She also explained that she did not believe Healy was in possession of any weapons. (*Id.* ¶ 11.)

The 911 operator advised a New York State Police dispatcher of the substance of Scianna's call, and five law enforcement officers — all of whom heard the dispatch — proceeded to Scianna's home. (*Id.* ¶¶ 12–16.) The first two officers to arrive at the home were New York State Police troopers Chaderick Greer and Albert Miano. (*Id.* ¶¶ 3–4, 16.)

Upon arriving at Scianna's home, Greer found Healy in the kitchen, standing behind an island. (*Id.* ¶¶ 20–21; Dep. of Chaderick Greer dated July 24, 2012, at 53:11–54:2, Ex. Q to Posner Aff.) Miano also entered the home but before entering the kitchen, he spoke with Scianna in the living room to obtain more information about Healy's situation. (Defs.' 56.1 ¶¶ 20–21; Dep. of Albert Miano dated Oct. 23, 2012, at 38:5–39:7, Ex. P to Posner Aff.; Scianna Dep. at 51:4–6; 52:23–53:10.) Scianna explained to Miano that Healy "was talking nonsense; that he was sweating profusely, breathing heavily; [and] that [Scianna] was in fear of him overdosing, possibly having a heart attack." (Scianna Dep. at 52:2–8.)

While Scianna spoke with Miano, Greer addressed Healy, who initially did not respond verbally. (Defs.' 56.1 ¶ 21.) Greer explained that he was there to help and asked if Healy was okay, but Healy did not answer. (*Id.* ¶ 22.) Miano soon entered the kitchen, and Healy began to make incoherent comments about money and knives[4] and to repeatedly open and close various kitchen drawers. (Defs.' 56.1 ¶¶ 24–27.) Although Healy never displayed or retrieved from the drawers either a knife or any object that could be used as a weapon, Healy's comments and actions led Greer and Miano to believe that Healy may have been searching for a knife. (*Id.* ¶¶ 27, 30–31; Miano Dep. at 52:15–53:8.) Based on Healy's behavior, Greer and Miano decided that they would detain Healy

---

[4] Witnesses' testimony about the nature of these comments varied. Miano testified that Healy asked the officers: "Where's my knife?" (Miano Dep. at 48:15.) Wesley Shaw, a police trooper who arrived later, heard Healy tell Miano and Greer: "I see you brought the knives with you," notwithstanding the fact that the officers carried no knives. (Dep. of Wesley Shaw dated July 24, 2012, at 37:4–5, Ex. R to Posner Aff.) Plaintiff does not dispute that Shaw heard Healy make the latter statement. (*See* Defs.' 56.1 ¶ 59; Pl.'s Local Civil Rule 56.1 Counterstatement of Material Facts ("Pl.'s 56.1"); S.D.N.Y. Local Civil Rule 56.1(c).

pursuant to New York Mental Hygiene Law § 9.41, which confers on state police the authority temporarily to "take into custody any person who appears to be mentally ill and is conducting himself . . . in a manner which is likely to result in serious harm to the person or others." (Defs.' 56.1 ¶¶ 28–29.)

While Greer and Milano were in the kitchen with Healy, defendant Benjamin Sistarenik, a Dutchess County Deputy Sheriff who had also heard the 911 dispatch, arrived. (Defs.' 56.1 ¶¶ 1, 15, 32, 37.) Sistarenik initially remained in the living room with Scianna. (*Id.* ¶ 32; Dep. of Benjamin Sistarenik dated Nov. 27, 2012, at 84:24–85:1, Ex. O to Posner Aff.) Meanwhile, in the kitchen, Healy continued to utter remarks about money and knives to Greer and Milano. (Defs.' 56.1 ¶ 35.) After Sistarenik heard Greer and Miano explain to Healy that the troopers wanted to take Healy to the hospital, Sistarenik called 911 and requested the dispatch of an ambulance for "psychiatric transport." (*Id.* ¶ 37–39; Sistarenik Dep. at 90:13–23.)[5]

Shortly thereafter, New York State Police troopers Craig Rose and Wesley Shaw arrived and entered Scianna's home. (Defs.' 56.1 ¶¶ 5, 6, 45, 46.) Still in the kitchen, Healy continued to make comments about knives, and to pace around the room "dialing the phone continuously," while Miano tried again unsuccessfully to have a conversation with him. (*Id.* ¶¶ 56–59.) Having concluded that Healy would not leave voluntarily, Miano instructed Healy to put his hands behind his back and explained that the

---

[5] Greer also testified that before he and Miano arrived at Scianna's home, emergency medical personnel were already dispatched "to be staging away from the scene[,] which means they didn't feel safe enough to come into the scene. So they would be in a close location on standby. When the scene was safe [the officers] would call them in and have them respond within a reasonable amount of time." (Greer Dep. at 50:6–12.)

troopers would take him to the hospital. (*Id.* ¶ 60.) Healy responded by becoming "combative" and "pulling back." (*Id.* ¶¶ 66–67, 137.)

Some of the troopers then approached Healy to "try[] to restrain him," and a "struggle ensued." (Scianna Dep. at 67:3–4; Pl.'s 56.1 ¶ 75.) Miano took a step toward Healy, and the two became "engaged nearly chest to chest in a struggle." (Greer Dep. at 72:16–17; Defs.' 56.1 ¶ 76.) Greer approached and grabbed one of Healy's arms. (Defs.' 56.1 ¶ 77.) Greer "felt Healy begin to circle counterclockwise"; in response, Greer "slid down" to "hug[]" one of Healy's thighs. (*Id.* ¶¶ 78–79; Greer Dep. at 79:23.) The officers decided to force Healy onto the floor so that they could handcuff him more easily. (Greer Dep. at 84:24–85:5; Pl.'s 56.1 ¶ 26.) Within a matter of between a few seconds and a minute, Greer and Miano brought Healy to the kitchen floor. (*Compare* Defs.' 56.1 ¶ 79 *with* Pl.'s 56.1 ¶ 79; Greer Dep. at 86:11–13; Shaw Dep. at 45:9–10.)

Once Healy was on the floor, with his "face down," Greer, Miano, Rose, and Shaw all attempted to handcuff him. (Defs.' 56.1 ¶ 135; Pl.'s 56.1 ¶ 37; Dep. of Craig Rose dated Oct. 23, 2012, at 64:6–8, Ex. S to Posner Aff.; Shaw Dep. at 48:23–25.) The troopers continued to direct Healy to submit to being handcuffed, but Healy kept "tugging" his own arms underneath his body. (Defs.' 56.1 ¶ 97; Shaw Dep. at 49:14–22.))

After a period of struggle, all four troopers "were all either standing or on top of . . . Healy attempting to bring both of his arms to his back." (Greer Dep. at 87:20–23.) Miano was eventually able to handcuff Healy's wrist by "just pull[ing]" Healy's right arm while other officers restrained Healy's other limbs. (Miano Dep. at 78:3–25.) Miano, Greer, and other officers were also able to handcuff Healy's left arm by "pulling on" it for a period of time, without using "any form of pain compliance." (Shaw Dep. at 49:8–50:2; *see* Miano Dep. at 68:20–69:3; Greer Dep. at 88:17–18.) Throughout their efforts to handcuff Healy, the officers decided not to use pepper spray because of the risk that the officers would be impacted by the spray. (Defs.' 56.1 ¶¶ 110–11.)

At some point while Healy was on the ground but not yet handcuffed, Sistarenik joined in the effort to forcibly restrain Healy. (*Id.* ¶ 95.) Sistarenik applied a taser model X26 to the back of Healy's right thigh. (*Id.* ¶ 114.) Sistarenik's first firing of the taser was in "stun" mode and lasted five seconds.[6] (Defs.' 56.1 ¶ 114.) After a two-second pause, Sistarenik again applied the taser to the back of Healy's right thigh and administered another five-second "stun" cycle.[7] (Defs.' 56.1 ¶ 116.) Sistarenik concluded that there was no purpose in tasing Healy a third time because Healy appeared to continue to struggle just as before. (*Compare id.* ¶ 117, *with* Pl.'s 56.1 ¶ 117.)[8] Although "Sistarenik was in a back up role to all of the"

---

[6] When a Taser is used in stun mode, "the end of the weapon is pressed against the target's body . . . and a pulsed electrical current is transferred to the adjacent muscles." (*See* U.S. DEP'T OF JUSTICE OFFICE OF JUSTICE PROGRAMS, NAT'L INST. OF JUSTICE, STUDY OF DEATHS FOLLOWING ELECTRO MUSCULAR DISRUPTION 51 (May 2011), Ex. J to Posner Aff, Dkt. No. 36-10.) When a Taser is used in dart mode, "two metal darts" are "fired" and "imbed[ded] in" a person's "skin or clothing." (*See id.*) In that mode, the "probes are connected to the weapon by wires that conduct a pulsed electrical current from the weapon into the target's body." (*See id.*) "The person typically becomes incapacitated . . . ." (*See id.* at 54.)

[7] The report of plaintiff's expert Charles W. Drago, a former police instructor and member of the Florida Department of Law Enforcement Commission on Standards and Training, concludes that Sistarenik "did not give . . . Healy the opportunity to comply with his commands" within a reasonable time period and "did not take the time to announce that he was going to deploy the Taser again as required in nationally accepted protocols." (*See* Ex. I to Posner Aff. at 11.)

[8] Plaintiff contends that Healy may have appeared to continue to struggle because he was either "responding to . . . the electrical shock from the taser

troopers (Defs.' 56.1 ¶ 19), Sistarenik had not asked the troopers if he should use the device at any point during the struggle, nor had any of the troopers directed Sistarenik to use the taser. (Pl.'s 56.1 ¶ 23; Sistarenik Dep. at 115:5–10.)

After the officers handcuffed Healy, Scianna entered the kitchen and saw Healy "face down on the kitchen floor." (Scianna Dep. at 72:15–17, 73:12–15.) She observed that his back was not "rising and falling" and told the officers: "he is not breathing." (*Id.* at 72:18–20; Pl.'s 56.1 ¶ 38.) One officer responded that Healy was "all right; he is just tuckered out." (Scianna Dep. at 72:20–22; Pl.'s 56.1 ¶ 39.) Scianna "kept staring at [Healy's] back" and again remarked: "No, he is not breathing." (Scianna Dep. at 72:22–23.)

"At some point" thereafter, a female trooper arrived at the house. (*Id.* at 73:23–25.) Only then did the officers "listen[] to what [Scianna] said" about Healy not breathing. (*Id.* at 74:4–6; Pl.'s 56.1 ¶ 40.) "[O]ne of the officers said, Oh, shit; he is not breathing; turn him over on his back." (Scianna Dep. at 74:6–7; Pl.'s 56.1 ¶ 41.) The officers "unrestrained [Healy and] turned him over on his back"; Healy appeared "blue." (Scianna Dep. at 74:8–9.) The officers "st[ood] around, looking down at" Healy. (*Id.* at 74:10–11.) Scianna asked: "Isn't anybody going to do CPR?" (*id.* at 74:11–12), and one of the state troopers responded: "I don't have my mask with me." (*id.* at 74:12–13.)

Before any medical personnel arrived, Sistarenik performed chest compressions on Healy (Defs.' 56.1 ¶ 124; Scianna Dep. at 74:17–24), but

---

[or] from being pushed and pulled by the five officers on top of him." (Pl.'s 56.1 ¶ 117.)

none of the officers performed "mouth-to-mouth" respiration.[9] (Scianna Dep. at 76:14–15; 91:10; Pl.'s 56.1 ¶¶ 41–42.)

After a length of time that is unclear, emergency medical service technicians and paramedics arrived at the scene (Defs.' 56.1 ¶ 126), and Sistarenik continued his efforts to perform chest compressions (*id.* ¶¶ 126–28.) The emergency personnel also administered medical care to Healy at the house. Healy had no pulse, and the paramedics took him to Northern Dutchess Hospital, where he was pronounced dead that morning. (Dep. of Heather Williams dated July 11, 2012, at 49:21, Ex. V to Posner Aff.; Ex. E to Posner Aff., Dkt. No. 36-5, at 2.) The resulting autopsy listed several causes of death: "cardiac arrhythmia due to acute cocaine intoxication during altercation with police"; "morbid obesity"; and "restraint in prone position and application of TASER x 2." (Ex. E to Posner Aff., Dkt. No. 36-5, at 2.) A toxicology report indicated that Healy had in his bloodstream 1,000 ng/mL of cocaine and 2,900 ng/mL of benzoylecgonine, a metabolic derivative of cocaine, "within the range of fatalities for these substances," and twice the level at which "[n]egative cardiovascular effects" may occur. (*Id.* at 10; Defs.' 56.1 ¶¶ 130–32.)

Healy's autopsy indicated that he had extensive abrasions and contusions, including of his forehead, frontal scalp, lips, tongue, right elbow, forearms, right leg, left wrist, and right calf, in addition to bruises on his thigh and torso consistent with administration of a taser, a defibrillator, and CPR. (Ex. E. to Posner Aff., Dkt. No. 36-5, at 3, 6.) One of his teeth was loose. (*Id.* at 5.) The medical examiner observed that Healy's brain had two "subarachnoid hemorrhage[s]." (*Id.* at 6.)

---

[9] Defendants contend that although Greer obtained an automated external defibrillator from his car, he did not use it because the device "advised against shocking Mr. Healy." (Defs.' 56.1 ¶¶ 123–25; *see also* Scianna Dep. at 91:12–13.)

None of the five officers sustained injuries during their struggle with Healy. (Pl.'s 56.1 ¶ 47.)

## III. DISCUSSION

### A.   Summary Judgment Standard

To prevail on their summary judgment motion, defendants "must show that 'there is no genuine [dispute] as to any material fact'" and that they are "'entitled to a judgment as a matter of law.'" *See Brown v. Henderson*, 257 F.3d 246, 251 (2d Cir. 2001) (quoting Fed. R. Civ. P. 56(c)). Defendants have the burden to "establish the absence of any material factual issues." *See Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003).

"A genuine issue of fact means that 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *See Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "In assessing a motion for summary judgment, [the] Court is 'required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment'" is sought. *See Gonzalez v. City of Schenectady*, 728 F.3d 149, 154 (2d Cir. 2013) (quoting *Terry*, 336 F.3d at 137); *see also Buckley v. Deloitte & Touche USA LLP*, 888 F. Supp. 2d 404, 414–15 (S.D.N.Y. 2012), *aff'd*, 541 F. App'x 62 (2d Cir. 2013). "It is not the province of the court itself to decide what inferences should be drawn . . . ; if there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper." *See Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010).

"[G]iven the difficult problem posed by a suit" alleging that an officer's excessive force caused a plaintiff's death — namely that "the witness most likely to contradict the . . . officer's story . . . is unable to testify" — "the court may not simply accept what may be a self-serving account by the . . . officer." *See O'Bert v. Vargo*, 331 F.3d 29, 37 (2d Cir. 2003) (some alterations omitted). "Rather, the court must also consider

10

circumstantial evidence that, if believed, would tend to discredit the . . . officer's story, and consider whether this evidence could convince a rational factfinder that the officer acted unreasonably." *See id.*; *accord Cyrus v. Town of Mukwonago*, 624 F.3d 856, 862 (7th Cir. 2010) (noting that "summary judgment is often inappropriate in excessive-force cases," "particularly" when "the one against whom force was used has died").

### B. Genuine Disputes of Fact Preclude Summary Judgment for Sistarenik on Plaintiff's Excessive Force Claim.

Deputy Sistarenik argues that he is entitled to summary judgment on plaintiff's excessive force claim on two separate grounds. Those two grounds mirror the two prongs of the defense of qualified immunity.

When a defendant raises the defense of qualified immunity at summary judgment, courts engage in a two-pronged inquiry. *See Tolan v. Cotton*, 134 S. Ct. 1861, 1865 (2014) (per curiam). "The first [prong] asks whether the facts, taken in the light most favorable to the party asserting the injury, show the officer's conduct violated a federal right." *See id.* (alterations omitted). "The second prong of the qualified-immunity analysis asks whether the right in question was 'clearly established' at the time of the violation." *See id.* at 1866. "[U]nder either prong" of the qualified immunity inquiry, "courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment." *See id.*

"Courts have discretion to decide the order in which to engage these two prongs." *See id.* Because Sistarenik asks this Court to resolve the excessive force claim in his favor on the first qualified immunity prong if possible (*see* Defs.' Mem. of Law in Supp. of Summ. J & J. on the Pleadings 22 (Dkt. No. 37) ("Defs.' Mem.")), the Court begins its analysis there.

### 1. There Exist Material Disputed Facts as to Whether Sistarenik's Use of Force Was Reasonable Under the Circumstances.

The inquiry into whether an arresting officer used excessive force in violation of the Fourth Amendment "requires a balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *See Tolan*, 134 S. Ct. at 1865. The U.S. Court of Appeals for the Second Circuit has instructed that courts should consider "at least three factors" when "conducting that balancing": "(1) the nature and severity of the crime leading to the arrest, (2) whether the suspect pose[d] an immediate threat to the safety of the officer or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight." *See Tracy v. Freshwater*, 623 F.3d 90, 96 (2d Cir. 2010) (citing *Graham v. Connor*, 490 U.S. 386, 396 (1980)).

In weighing those factors, colloquially known as the *Graham* factors, after the U.S. Supreme Court case where they were first enumerated, a court must be "careful to evaluate the record from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *See id*. Courts must also "make allowance for the fact that police officers are often forced to make split-second judgments — in circumstances that are tense, uncertain, and rapidly evolving — about the amount of force that is necessary in a particular situation." *See id.* The overall inquiry is case-specific, and although the *Graham* factors guide the Court's inquiry, "in the end, [the Court] must still slosh [its] way through the factbound morass of 'reasonableness.'" *See Scott v. Harris*, 550 U.S. 372, 382 (2007).

Sistarenik's position is that he and the troopers were confronted with a rapidly unfolding situation in which Healy forcefully resisted the officers' attempts to restrain and arrest him. Under the circumstances, Sistarenik contends, his deployment of a taser for two five-second cycles in stun

12

mode did not constitute a Fourth Amendment violation. For the following reasons, the Court concludes that it cannot reach that conclusion as a matter of law on this record.

>   a.   *Sistarenik's Use of the Taser in Stun Mode Constituted a*
>        *Significant Degree of Force.*

When a taser is used in stun mode, an electrical current is sent to the muscles in the area against which the weapon is pressed. (*See* STUDY OF DEATHS FOLLOWING ELECTRO MUSCULAR DISRUPTION 51, 54, Ex. J to Posner Aff.) Use of a taser in this manner "serves a pain compliance purpose." *See id.*; *see also Mattos v. Agarano*, 661 F.3d 433, 443 (9th Cir. 2011) (en banc) (shocks delivered in such a manner may be "extremely painful"); Sistarenik Dep. at 155 (Sistarenik understood that use of the taser in stun mode would cause Healy pain).

Based on these authorities, the Court concludes that Sistarenik's use of a taser in stun mode constituted a "significant degree of force." *See Tracy*, 623 F.3d at 98 (pepper spray); *see also Abbott v. Sangamon Cnty.*, 705 F.3d 706, 724 (7th Cir. 2013). Defendants themselves agree as much. (*See* Defs.' Reply Mem. of Law in Supp. of Summ. J. & Qualified Immunity 10 (Dkt. No. 46) ("Defs.' Reply Mem.") (arguing that "[t]he overwhelming body of decisional law . . . recognizes taser use in stun mode as a . . . less lethal use of force akin to pepper spray").

The Court now proceeds to address the governmental interests against which the "intrusion on [Healy's] Fourth Amendment interests" must be balanced. *See Tolan*, 134 S. Ct. at 1865; *Tracy*, 623 F.3d at 96.

> b.   *On this Record, a Reasonable Factfinder Could Conclude that The* Graham *Factors Provide Only Meager Support for Sistarenik's Use of the Taser.*

> i.   The Officers Sought to Take Healy into Custody for Non-Criminal Conduct that a Jury Could Reasonably Conclude Posed No Danger to Others.

The only basis that defendants have cited for Healy's arrest is New York Mental Hygiene Law § 9.41, which, as noted, permits officers to "take into custody any person who appears to be mentally ill and is conducting himself . . . in a manner which is likely to result in serious harm to the person or others." "[C]onduct equivalent to mental illness [that] can result in custody" pursuant to section 9.41 "cannot be considered" a criminal "offense."[10] *See Disability Advocates, Inc. v. McMahon*, 279 F. Supp. 2d 158, 165 (N.D.N.Y. 2003) (citing *People v. Crank*, 590 N.Y.S.2d 149 (1992); N.Y. Penal Law § 10.00(1)).

On this record, a reasonable jury could conclude that the conduct for which the officers sought to detain Healy was non-criminal and non-violent and was pursuant to the portion of the statute governing conduct "likely to result in serious harm" to Healy himself, rather than to any "others." For example, in her 911 call, Scianna explained that she did not believe that Healy was in possession of any weapons. (Defs.' 56.1 ¶ 11.) Similarly, when the troopers arrived, Scianna explained that her fear was of Healy "overdosing, possibly having a heart attack." (Scianna Dep. at 52:7–8.) And although the officers observed Healy opening and closing kitchen drawers and muttering about knives, Healy never retrieved any knife or other object that could be used as a weapon. (Miano Dep. at 52:15–53:8.) Moreover, the only undisputed comment by Healy about a knife is that Miano and Greer "brought the knives with [them]" — essentially a

---

[10] Defendants concede that Healy "had not committed a crime." (*See* Defs.' Mem. 26.)

nonsensical comment consistent with Healy being confused rather than posing any danger to others. (Defs.' 56.1 ¶ 59.)

In sum, taking the facts in the light most favorable to plaintiff, a jury could reasonably conclude that when Greer and Miano decided that they would detain Healy pursuant to section 9.41, the officers did so solely for Healy's own safety. The first *Graham* factor — the nature and severity of the crime leading to the arrest — therefore provides virtually no support for Sistarenik's use of the taser against Healy.

> ii.   A Jury Could Reasonably Conclude that Healy Did Not Pose an Immediate Threat to the Officers' Safety when Sistarenik Fired the Taser.

Taken in the light most favorable to plaintiff, a jury could reasonably conclude that Healy did not pose an immediate threat to the officers at the time that Sistarenik tased him. *See Tracy*, 623 F.3d at 98 (analyzing the reasonableness of an officer's use of force based on the threat, or lack thereof, that an arrestee posed at the particular time that force was used); *see also Greenfield v. Tomaine*, 2011 WL 2714221, at *5 (S.D.N.Y. May 10, 2011), *adopted,* 2011 WL 2714219 (S.D.N.Y. July 12, 2011).

First, there is no evidence in this record that once the officers forced Healy to the floor, Healy was in possession of a knife or any weapon or had access to a weapon. (It was only after Healy was on the floor that the taser was used on him.)

Second, a reasonable jury could conclude that Healy was no longer resisting the officers when he was tased. There is, to be sure, in this record evidence that Healy kicked Rose at some point. But there are conflicting accounts of when the purported kick occurred in relation to Sistarenik's use of the taser. Sistarenik testified at his deposition that after Healy was taken to the floor, Healy kicked trooper Rose and Sistarenik then tased him. (*See* Defs.' 56.1 ¶¶ 88, 94.) But Greer testified that he saw taser marks on Healy's thigh *before* the officers took Healy to the floor. (*See* Greer Dep.

at 97:4.) On Greer's account of the incident, Sistarenik deployed the taser before Healy kicked Rose.

These discrepancies in the officers' testimony about the sequence of events are material because a reasonable jury could conclude that Healy no longer posed a danger to officer safety at the time Sistarenik tased him. Because "the credibility of witnesses is exclusively for the determination by the jury," the Court is not able to resolve the witnesses' conflicting accounts. *See Cameron v. City of New York*, 598 F.3d 50, 61 (2d Cir. 2010). In light of: (1) the material contradictions in witnesses' testimony about the kick; (2) the peculiar absence from key witnesses' testimony of any reference to a kick (*see* Pl.'s 56.1 ¶¶ 88, 94 (citing Miano's, Shaw's, and Scianna's testimony)); and (3) the fact that Healy himself is not available to testify in this case, the Court cannot conclude as a matter of law that Healy kicked Rose after the officers had already forced Healy to the floor. *See O'Bert*, 331 F.3d at 37 (on a motion for summary judgment in an excessive force case, "where the witness most likely to contradict the officers' testimony is dead," "the court may not simply accept what may be a self-serving account by the police officer[s]").

Third, although defendants point to Scianna's handwritten statement given shortly after Healy's death that Healy was "combative" with the officers (*see* Defs.' 56.1 ¶ 56), the fuller excerpt from Scianna's statement lends little support to defendants' argument that Healy posed a threat to officer safety once he was on the floor:

> When the Troopers arrived they tried talking to him[. H]e was saying nonsensical things[.] I pointed out the profuse sweating. The Troopers said they were going to take . . . . [*illegible*] He became combati[]ve. Then, they tried handcuffing him, 5 officers were subdu[]ing him.

(Ex. B to Posner Aff.) The time elapsed between the events described in this statement is not clear, and there is no indication in that statement that Healy remained combative once on the floor. At her deposition, Scianna

characterized Healy's reaction to the officers' initial directive that he submit to being handcuffed as that Healy was "pulling back [and] resisting." (Scianna Dep. at 69:15–16.)[11] From the totality of Scianna's testimony, then, a reasonable jury could conclude that in describing Healy's behavior as "combative," she meant that before being brought to the floor, Healy refused to give his hands up to the officers to be handcuffed. And a reasonable jury could conclude that Scianna's "combative" description did not refer to any threatening conduct by Healy once the officers had forced him to the floor.

In short, a jury could reasonably conclude on this record that Healy did not "pose an immediate threat to the safety of the officer[s] or others" at the time that Sistarenik tased Healy. *See Tracy*, 623 F.3d at 96.

iii.  A Jury Could Reasonably Conclude that when Tased, Healy Was Not Actively Resisting Arrest.

Plaintiff readily concedes that Healy was engaged in a struggle with the officers, including after the officers brought Healy to the floor. The disputed question is whether Healy's conduct during that struggle amounted to "actively resisting arrest," such as would weigh in favor of the reasonableness of Sistarenik's using the taser. *See Tracy*, 623 F.3d at 96.

It bears emphasizing that regardless of whether Healy "actively resist[ed] arrest" such as by "fight[ing] back" at some point before being brought to the kitchen floor, *see Tracy*, 623 F.3d at 97, that conduct "does not" necessarily "justify the later use of the Taser" once Healy was on the floor. *See Parker v. Gerrish*, 547 F.3d 1, 10 (1st Cir. 2008); *see also Tracy*, 623 F.3d at 98 (officer's otherwise reasonable use of pepper spray became excessive once the arrestee was "offering no further active resistance");

---

[11] Scianna testified that she was unable to see whether Healy "in any way sw[u]ng his arm or any of his arms to try to push or strike an officer." *See id.* at 69:18–22.

*Meyers v. Baltimore Cnty.*, 713 F.3d 723, 733 (4th Cir. 2013) ("force justified at the beginning of an encounter is not justified even seconds later if the justification for the initial force has been eliminated").

For the reasons that follow, the Court concludes that a jury could reasonably find that at the time that Sistarenik tased Healy, Healy's resistance was largely passive; for that reason, the third *Graham* "factor offer[s] little support for the use of significant force against him." *See Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1092 (9th Cir. 2013), *cert. denied*, 134 S. Ct. 1292 (2014).

Greer testified that once the officers decided to take Healy to the kitchen floor, it took only "seconds" to accomplish that goal. (Greer Dep. at 85:13–19.) And "[s]econds" after Healy was on the floor, each officer was "either standing or on top of Mr. Healy attempting to bring both of his arms to his back to handcuff him." (*Id.* at 87:3–23.) Once Healy was on the kitchen floor, he never "g[o]t back up." (Shaw Dep. at 53: 7–8.) The various officers each "ha[d] a part of [Healy's] body" and were therefore "able to keep him down." (*Id.* at 52:21–23.) Miano, Shaw, and Greer all testified that once the officers were "on top of" Healy, they were able to handcuff Healy by just "tugging" and "pull[ing]" on Healy's arms. (Shaw Dep. at 49:8–50:2; Miano Dep. at 68:20–69:3, 78:3–25; Greer Dep. at 88:17–18.) The officers had to "pull" Healy's arms to handcuff him because he made efforts to "tug[]" his arms "underneath his body." (Shaw Dep. at 49:20–22.)

Viewing the evidence in the light most favorable to plaintiff, Healy's degree of resistance once on the floor was limited to making it more challenging for the officers to handcuff him. And it was at this point that Sistarenik tased Healy. In conjunction with the other officers' testimony that they had largely restrained Healy by holding different parts of Healy's body or sitting on top of him, a reasonable factfinder could find that Healy was neither "actively resisting arrest" nor "pose[d] a continuing threat to the officers' safety." *See Meyers*, 713 F.3d at 733.

Several courts of appeals have determined that similar conduct by arrestees does not rise to the level of "active resistance." *See, e.g., id.* (when an arrestee "stiffened his body, keeping it rigid while he was on the ground" as "several officers sat on the arrestee's back, he was "no longer actively resisting arrest, and did not pose a continuing threat to the officers' safety"); *Mattos*, 661 F.3d at 445 (an arrestee who "refused to get out of her car when requested to do so and later stiffened her body and clutched her steering wheel to frustrate the officers' efforts to remove her from her car" "engaged in some resistance to arrest" but not to a degree that would preclude a jury from determining that use of a taser was constitutionally excessive); *Cyrus*, 624 F.3d at 858, 863 (when a suspect "tucked" his hands "underneath his stomach and . . . did not comply with the officers' commands to produce them for handcuffing," summary judgment in favor of the officers was "inappropriate" in significant part because despite the suspect's "refus[al] to release his arms for handcuffing," the officers "knew that [the suspect] was unarmed and there was little risk [he] could access a weapon" while restrained); *see also Gravelet-Blondin*, 728 F.3d at 1092 (a suspect who "continually ignored officer commands to remove his hands from his pockets" and to produce his hands for handcuffing was not "particularly bellicose," so "the third *Graham* factor offered little support for the use of significant force against him").

To support their position that they are entitled to summary judgment in their favor, defendants cite testimony that even after Healy was on the floor, he "continued to fight. Continued to resist and not give us his hands." (Sistarenik Dep. at 117:16–17); *see also id.* at 117:25–118:6 ("He was still, you know, squirming and fighting and would not give up his hands."). Defendants also contend that even after Healy was handcuffed, he was "still struggling . . . still moving around, still jerking around." (Sistarenik Dep. at 119:16–17, 119:21–22; *see also* Shaw Dep. at 51:19–21 (after being handcuffed, Healy "kind of wriggled around").)

The evidence on which defendants rely does not alter the Court's conclusion regarding the third *Graham* factor, for two reasons. First, on this motion for summary judgment the Court is not required to — and in fact does not — construe the record in the light most favorable to defendants, the moving parties. *See Giannullo*, 322 F.3d at 140; *see also Cyrus*, 624 F.3d at 862. The fact that defendants are able to muster some record support for their position does not compel summary judgment in their favor. Second, much of the evidence to which defendants point regarding Healy's resistance is equivocal, since Sistarenik's testimony linked Healy's fighting with his not giving the officers his hands. (Sistarenik Dep. at 117:16–17, 118:2–3); *see, e.g., Meyers*, 713 F.3d at 733; *Mattos*, 661 F.3d at 445; *Cyrus*, 624 F.3d at 858; *Gravelet-Blondin*, 728 F.3d at 1092. A jury could reasonably find that Sistarenik equated "fighting" with Healy's largely passive refusal to submit his hands to the officers' cuffs. In addition, his "wriggl[ing] around" (Shaw Dep. at 51:19–21) might have been due to his "responding to . . . the electrical shock from the taser" or "being pushed and pulled by the five officers on top of him." (Pl.'s 56.1 ¶ 117.) It is for the jury to decide such issues.

In short, on this record, a reasonable factfinder would be entitled to draw the conclusion that at the time that Sistarenik tased Healy — who was at that time on the floor — was "offering no further active resistance" to the officers' attempts to arrest him. *See Tracy*, 623 F.3d at 98.

       c.   *The Court Cannot Conclude as a Matter of Law that the Officers' Interests Justified Sistarenik's Firing the Taser on Healy.*

As noted above, the ultimate excessive force analysis "requires balancing the nature and quality of the intrusion on [Healy's] Fourth Amendment interests against the countervailing governmental interests at stake." *See id.* at 96. In addition to the specific *Graham* factors enumerated in *Tracy* and discussed above, the Court must also consider any other relevant circumstances. *See Tracy*, 623 F.3d at 98; *Graham*, 490 U.S. at 396.

Two such circumstances relevant here are Sistarenik's failure to warn Healy before tasing him the first time and Sistarenik's failure to give Healy any time to recover before administering the taser again. Several courts have noted that an "officer's failure to warn" before using a taser "when it is plausible to [warn], weighs in favor of finding a constitutional violation." *See Mattos*, 661 F.3d at 451; *Negron v. City of New York*, 976 F. Supp. 2d 360, 367 (E.D.N.Y. 2013) (collecting cases), *appeal docketed*, No. 13-4220 (2d Cir. Nov. 1, 2013). Courts have similarly weighed as a relevant circumstance in the constitutional analysis the fact that an officer administered multiple "tasings in such rapid succession providing no time for [an arrestee] to recover from the extreme pain she experienced, gather herself, and reconsider her refusal to" submit to being arrested. [12] *See, e.g.*, *Mattos*, 661 F.3d at 445.

Considering these circumstances and all those discussed above, a reasonable jury would be entitled to conclude that Sistarenik violated the Fourth Amendment by administering two taser shocks against Healy in short succession without advance warning and while Healy was restrained on the floor by four other officers. In reaching that conclusion, the Court relies on a consensus among those federal courts of appeals to have reached the issue that it is "generally . . . unreasonable for officers to deploy a taser against a misdemeanant who is not actively resisting arrest." *See Abbott*, 705 F.3d at 730 (collecting cases); *see also Meyers*, 713 F.3d at 734; *Austin v. Redford Twp. Police Dep't*, 690 F.3d 490, 498 (6th Cir. 2012); *Mattos*, 661 F.3d at 446, 451; *Oliver v. Fiorino*, 586 F.3d 898, 907 (11th Cir. 2009); *Brown v. City of Golden Valley*, 574 F.3d 491, 499 (8th Cir. 2009);

---

[12] As noted, plaintiff's expert Charles W. Drago concluded that Sistarenik "did not give . . . Healy the opportunity to comply with his commands" within a reasonable time period and "did not take the time to announce that he was going to deploy the Taser again as required in nationally accepted protocols." (*See* Ex. I to Posner Aff. at 11.)

*Parker*, 547 F.3d at 11; *Casey v. City of Federal Heights*, 509 F.3d 1278 (10th Cir. 2007).

The Court is mindful of its obligation to "evaluate the record from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight" and to "make allowance for the fact that police officers are often forced to make split-second judgments — in circumstances that are tense, uncertain, and rapidly evolving — about the amount of force that is necessary in a particular situation." *See Tracy*, 623 F.3d at 96. Nonetheless, "the fact that an initial use of force" — to physically restrain Healy — was "justified does not mean that all subsequent uses of . . . force were similarly justified." *See Abbott*, 705 F.3d at 729; *see id.* at 731. In the course of responding to evolving scenarios, officers may encounter circumstances that compel them to recalibrate the amount of force deployed. *See, e.g., Tracy*, 623 F.3d at 98. Here, because a jury reasonably could determine that the totality of the relevant *Graham* factors "tip[] so heavily in [Healy's] favor," the Court concludes that the "rapidly unfolding nature" of the events at Scianna's home does not as a matter of law compel judgment in Sistarenik's favor on plaintiff's excessive force claim. *See Abbott*, 705 F.3d at 731.

### 2.   *Sistarenik Is Not Entitled to Qualified Immunity on Plaintiff's Excessive Force Claim.*

Sistarenik also contends that he is entitled to judgment in his favor on plaintiff's excessive force claim on the second prong of the qualified immunity analysis. Pursuant to that prong, a court "asks whether the right in question was 'clearly established' at the time of the violation." *See Tolan*, 134 S. Ct. at 1866. "Governmental actors are shielded from liability for civil damages if their actions did not violate clearly established statutory damages or constitutional rights of which a reasonable person would have known." *See id.* "Qualified immunity is an affirmative defense and the burden is on the defendant-official to establish it on a motion for summary judgment." *See Bailey v. Pataki*, 708 F.3d 391, 404 (2d Cir. 2013).

For a court to conclude that a right was clearly established at the relevant time, "existing precedent must have placed the . . . constitutional question beyond debate." *See Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2083 (2011). "The salient question is whether the state of the law at the time of an incident provided fair warning to the defendants that their alleged conduct was unconstitutional." *See Tolan*, 134 S. Ct. at 1866 (alterations omitted). Even if the Second Circuit has not precisely determined the contours of a right, that right may be clearly established such that a defendant is "stripped . . . of his immunity" as long as "decisions . . . from courts in other circuits" "clearly foreshadow a particular ruling on the issue." *See Bailey*, 708 F.3d at 405; *Scott v. Fischer*, 616 F.3d 100, 105 (2d Cir. 2010); *see also Terebesi v. Torresso*, --- F.3d ---, No. 12-3867, slip op. at 21 & n.12, 33 & n.20 (2d Cir. Aug. 21, 2014).

The question here is straightforward: was it clearly established on March 10, 2010 that in effectuating a lawful arrest, an officer used excessive force by firing a taser in stun mode against an individual not suspected of a crime and who no longer actively resisted arrest?[13] This Court answers that question in the affirmative.

In *Tracy*, the Second Circuit reversed the district court's grant of qualified immunity on a police officer's motion for summary judgment in an excessive force case arising out of an April 2000 incident. *See* 623 F.3d at 96–98. Prior to the arrest, the officers "suspected that Tracy might be wanted in connection with a criminal offense." *See id.* at 93. Crediting Tracy's account of the arrest that ensued, the court concluded as to one

---

[13] In conducting the qualified immunity analysis on a motion for summary judgment, "courts must take care not to define a case's 'context' in a manner that imports genuinely disputed factual propositions." *See Tolan*, 134 S. Ct. at 1861. Accordingly, in defining the scope of the right at issue, the Court construes the record in the light most favorable to plaintiff, the non-moving party. *See id.*; *see also Tracy*, 623 F.3d at 93.

incident that "a reasonable juror could find that the use of pepper spray deployed mere inches away from the face of a defendant already in handcuffs and offering no further active resistance constituted an unreasonable use of force." *See id.* at 98. In denying qualified immunity, the court relied on the conclusion of several other circuits that pepper spray "should not be used lightly or gratuitously against an arrestee who . . . poses no immediate threat to the arresting officer." *See id.*

*Tracy* involved pepper spray; it did not involve a taser. But just as in *Tracy*, a jury here could reasonably determine on this record that Healy no longer posed a threat to the arresting officers at the time he was repeatedly tased. And as in *Tracy*, the use of force here was "significant," "somewhere in the middle of the nonlethal-force spectrum" and "on par with pepper spray." *See Abbott*, 705 F.3d at 724; *see also* Defs.' Reply Mem. 10. It was therefore clearly established law in the Second Circuit as of April 2000 that it was a Fourth Amendment violation to use "significant" force against arrestees who no longer actively resisted arrest or posed a threat to officer safety, regardless of whether that significant force emanated from a pepper spray canister or the trigger of a taser. *See Tracy*, 623 F.3d at 98; *Bailey*, 708 F.3d at 405; *Terebesi*, No. 12-3867, slip op. at 33 & n.20.

Decisions involving tasers from at least four other federal courts of appeals make pellucid that the contours of the constitutional right at issue here were indeed clearly established by March 2010. *See, e.g.*, *Meyers*, 713 F.3d at 734–35 (4th Cir. 2013) (clearly established in 2007 that it was excessive force to use a taser against a suspect once "unarmed and effectively . . . secured with several officers sitting on his back"); *Brown*, 574 F.3d at 499 (8th Cir. 2009) (clearly established that "it was unlawful to Taser a nonviolent, suspected misdemeanant who was not fleeing or resisting arrest[ and] who posed little to no threat to anyone's safety"); *Casey*, 509 F.3d at 1281–84 (10th Cir. 2007) (clearly established that it was excessive force to use a taser in dart mode against a misdemeanant who did not pose an immediate threat to officer safety and who was not

actively resisting arrest); *see also Hagans v. Franklin Cnty. Sheriff's Office*, 695 F.3d 505, 509 (6th Cir. 2012) (for qualified immunity purposes regarding a 2007 incident, "[a] suspect's active resistance . . . marks the line between reasonable and unreasonable tasing")

The fact that many of these decisions involve the use of tasers in dart rather than stun mode is not a dispositive difference, given that both methods of deploying a taser constitute "significant" force in Fourth Amendment jurisprudence. *See Tracy*, 623 F.3d at 98; *Abbott*, 705 F.3d at 724. The courts of appeals are in broad agreement that for qualified immunity purposes, "it does not matter [if] no case [in a particular] court directly addresses the use of a particular weapon; . . . an officer is not entitled to qualified immunity on the grounds that the law is not clearly established every time a novel method is used to inflict injury." *See Gravelet-Blondin*, 728 F.3d at 1093 (alterations and quotation marks omitted); *see also Tracy*, 623 F.3d at 98 (relying only on out-of-circuit decisions to conclude that use of pepper spray could constitute clearly established excessive force); *Fils v. City of Aventura*, 647 F.3d 1272, 1289, 1292 (11th Cir. 2011) (relying on a case involving pepper spray to determine that a tasing incident constituted clearly established excessive force); *Meyers*, 713 F.3d at 734 ("The fact that the force used in the present case emanated from a taser, rather than from a more traditional device is not dispositive.").

Defendant Sistarenik seeks refuge in the Second Circuit's Summary Order in *Crowell v. Kirkpatrick*, 400 F. App'x 592 (2d Cir. 2010), which affirmed a district court's grant of qualified immunity to officers who used a taser in stun mode against individuals who "actively resisted" arrest for trespass by "chain[ing] themselves" to a barrel drum and repeatedly refusing to unchain themselves despite warnings that they would be tased if they did not leave the property.

*Crowell* provides no safe harbor for Sistarenik. First and foremost, as a Summary Order, *Crowell* simply has "no[] . . . precedential effect." *See* 2d

Cir. Local R. 32.1.1(b). Second, because *Crowell*'s publication post-dated the March 2010 incident at issue here, Sistarenik could not have relied on that decision as a guide to conduct himself. Third, *Crowell* "d[id] not suggest that the use of a taser to effect an arrest is always, or even often, objectively reasonable." *See* 400 F. App'x at 595. Instead, *Crowell* determined that the totality of the circumstances presented in *that* case did not amount to a clearly established constitutional violation. Fourth, factual distinctions between *Crowell* and this case abound. Unlike the *Crowell* plaintiffs, who continued to resist arrest before being tased, Healy was largely subdued on the floor (or so a jury could reasonably find). And unlike the officers in *Crowell* who had "attempted several alternate means" of forcing the plaintiffs to unchain themselves before deploying the taser "as a last resort," Sistarenik used the taser even though the officers had already successfully restrained Healy, again, viewing the evidence in the light most favorable to plaintiff. *See id.* For these reasons, the Court concludes that with regard to the particular circumstances of this case, *Crowell* has neither persuasive nor precedential value.

Construed in the light most favorable to plaintiff, the record in this case precludes a grant of qualified immunity in Sistarenik's favor. *See Tolan*, 134 S. Ct. at 1866.

**C.   Summary Judgment in Defendants' Favor Is Not Warranted on Plaintiff's Assault and Battery Claims.**

"[E]xcept for § 1983's" color-of-state-law requirement, "the essential elements" of an excessive force claim and of New York "state law assault and battery" claims are "substantially identical." *See Posr v. Doherty*, 944 F.2d 91, 94 (2d Cir. 1991). Defendants make no separate argument — and no state-law immunity argument — why judgment in their favor is warranted on these state law claims. Accordingly, neither Sistarenik nor the County defendants whom plaintiff seeks to hold vicariously liable are entitled to summary judgment on plaintiff's assault and battery claims.

### D. Genuine Issues of Material Fact Regarding the Cause of Healy's Death Preclude Summary Judgment on Plaintiff's Wrongful Death Claim.

As for plaintiff's wrongful death claim, defendants contend that the only "evidence supporting plaintiff's theory that the tasing . . . caused Healy's death" is in the report of plaintiff's expert Dr. Lawrence Gessman. (Defs.' Mem. 15.)[14] Defendants have filed a separate motion to preclude the Court from considering Dr. Gessman's report. (Dkt. No. 38.) Because Dr. Gessman's report is inadmissible, the argument goes, there is no evidence from which a reasonable factfinder could conclude that Sistarenik's use of the taser caused Healy's death.

In an order dated March 24, 2014, the Court "dismissed as premature" defendants' motion to preclude Dr. Gessman's testimony, explaining that "[t]he report is not necessary to decide defendants' pending motion for summary judgment." (Dkt. No. 48.) The Court now elaborates on that conclusion: assuming, without deciding, that Dr. Gessman's report is inadmissible, sufficient record evidence would still permit a reasonable jury to conclude that Sistarenik's use of the taser caused Healy's death.

To prevail on a claim of wrongful death pursuant to New York law, "a plaintiff must establish '(1) the death of a human being, (2) the wrongful act, neglect or default of the defendant by which the decedent's death was caused, (3) the survival of distributes who suffered pecuniary loss by reason of the death of decedent, and (4) the appointment of a personal representative of the decedent." *See Hollman v. Taser Int'l Inc.*, 928 F. Supp. 2d 657, 683 (E.D.N.Y. 2013) (citing N.Y. Est. Powers & Trusts Law § 5-4.1). Defendants only contest that Healy's death was caused by Sistarenik tasing him.

_____

[14] For the same reasons that the Court rejects defendants' arguments regarding plaintiff's excessive force claim, the Court also rejects defendants' remaining arguments regarding plaintiff's wrongful death claim.

A plaintiff can demonstrate causation by showing that a defendant's acts or omissions were a "substantial cause of the events [that] produced the injury." *See Derdiarian v. Felix Contracting Corp.*, 51 N.Y.2d 308, 315 (1980) (citing RESTATEMENT (SECOND) OF TORTS § 431)); *see also Schipani v. McLeod*, 541 F.3d 158, 162–63 (2d Cir. 2008). A plaintiff need not demonstrate that a defendant's negligence or recklessness was the sole cause of his injuries. *See, e.g.*, *Wolfe v. Samaritan Hospital*, 104 A.D.2d 143, 145 (3d Dep't 1984).

Leaving aside Dr. Gessman's report, the record contains the following evidence that Sistarenik's use of the taser was a "substantial cause" of Healy's death. *See Derdiarian*, 51 N.Y.2d at 315.

First, the autopsy report itself states that a "*significant* condition[] contributing to [Healy's] death" was "restraint in prone position [sic] application of TASER x 2." (Ex. E to Posner Aff., Dkt. No. 36-5, at 2 (emphasis added).) Defendants would have the Court credit those portions of the autopsy report that conclude that Healy's death was also caused by "cardiac arrhythmia due to acute cocaine intoxication during altercation with police" and "morbid obesity" but not credit the autopsy's separate conclusion regarding the application of the taser. (*Id.* at 4.) The Court is not at liberty to pick and choose among such evidence at the summary judgment stage.

Second, the expert report of Charles Drago states that on September 30, 2009 "[t]he manufacturer of the Taser issued a warning to all users" that there is an increased risk of "arrest-related death" among individuals who have ingested drugs. (Ex. I to Posner Aff., Dkt. No. 36-9, at 6.) For that reason, "[i]n a physiologically . . . compromised person any physiologic or metabolic change may cause or contribute to death or serious injury." (*Id.*). A jury could infer from that warning that when a taser is "pressed against the" body of an arrestee who has ingested cocaine "and a pulsed electrical current is transferred to the [target's] adjacent muscles" (Ex. J to Posner Aff., at 51), "death" may result (Ex. I to Posner Aff., at 6).

28

Third, Drago's report quotes the following language from a June 2005 "Taser International Bulletin": "[P]ersons showing symptoms of excited delirium[15] . . . are at significant and potentially fatal health risks from further prolonged exertion and / or impaired breathing." (*Id.* at 12.) For that reason, "the total duration of TASER system stimulation" should be "minimize[d]." (*Id.*)

A jury could reasonably conclude from this evidence that Sistarenik's use of the taser on Healy — who Sistarenik knew had ingested significant amounts of cocaine — was a substantial cause of Healy's death, and that is true whether Dr. Gessman's report is admitted or excluded from evidence. *See Derdiarian*, 51 N.Y.2d at 315 (1980); *Wolfe*, 104 A.D.2d at 145; RESTATEMENT (SECOND) OF TORTS § 431.

### E. Genuine Issues of Material Fact Preclude Summary Judgment for Sistarenik on Plaintiff's Claim for Failure to Provide Medical Care.

Sistarenik also seeks judgment in his favor on plaintiff's claim that Sistarenik failed to provide adequate medical care to Healy in violation of the Due Process Clause of the Fourteenth Amendment. Sistarenik argues that he is entitled to qualified immunity under either prong of that doctrine. The Court disagrees.

"The Due Process Clause . . . require[s] the responsible government or governmental agency to provide medical care to persons . . . who have been injured while being apprehended by the police." *See City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983). An arresting officer discharges that "constitutional obligation by seeing that [the arrestee is] taken promptly to a hospital that provide[s] the treatment necessary for [the]

---

[15] Both plaintiff's expert Drago and defense expert Dr. Charles V. Wetli concluded that Healy exhibited symptoms of "excited delirium" at the time of the arrest. (*Id.*; Ex. F to Posner Aff., Dkt. No. 36-6, at 3–4.)

injury." *See id.* at 245. It was therefore clearly established in 2010 that once Sistarenik knew that Healy was not breathing, Sistarenik had a constitutional obligation to ensure that Healy was promptly taken to a hospital or otherwise received adequate medical care. Accordingly, the Court rejects Sistarenik's contention that he is entitled to judgment in his favor on the second prong of the qualified immunity inquiry.

As for the first prong of the qualified immunity analysis, material disputes of fact preclude summary judgment for Sistarenik.

Scianna testified that after the officers handcuffed Healy, she observed that Healy's back was not "rising and falling." (Scianna Dep. at 72:19–20.) She informed the officers that Healy was "not breathing," but one officer responded that Healy was "all right" and "just tuckered out." (*Id.* at 72:20–22.) Scianna observed that Healy's back was still and reiterated that he was "not breathing." (*Id.* at 72:22–23.) Only after some time passed did the officers "listen[] to what [Scianna] said" about Healy not breathing. (*Id.* at 74:4–6; Pl.'s 56.1 ¶ 40.) In other words, for some period of time, none of the officers — including Sistarenik — provided or arranged for medical care for Healy despite being put on notice that Healy was not breathing.

Sistarenik nonetheless contends that Scianna's testimony about the officers' delay in providing Healy medical attention is irrelevant because Sistarenik had already called for an ambulance even before the officers took Healy to the ground. (Sistarenik Dep. at 90:13–23.) Because the ambulance was already on its way, the argument goes, Sistarenik had discharged his constitutional duty to Healy.

But the record is not as clear as Sistarenik represents. Greer separately testified that the practice of Dutchess County emergency medical personnel was to "stag[e] away from the scene" when "they didn't feel safe enough to come into the scene." (Greer Dep. at 50:7–8.) In Healy's case, the medical personnel "would be in a close location on standby. When the scene was safe [the officers] would call them in and have them respond within a reasonable amount of time." (*Id.* at 50:9–12.) There is no

30

evidence in the record regarding when, once Healy was handcuffed, the officers called medical personnel to come to the scene. Nor do defendants cite any undisputed testimony regarding the time that elapsed between Healy's being handcuffed and the arrival of the ambulances. (*See generally* Defs.' 56.1.)

In short, from Scianna's and Greer's testimony, a reasonable jury would be able to conclude that at the time that Scianna put Sistarenik on notice that Healy was not breathing, neither Sistarenik nor the other officers had taken steps to notify the medical personnel "staging" offsite that they should rush to Scianna's home. And Sistarenik's failure to act, if proven, could constitute "deliberate indifference to [Healy's] serious medical needs." *See Harrison v. Barkley*, 219 F.3d 132, 136 (2d Cir. 2000); *Caiozzo v. Koreman*, 581 F.3d 63, 71 (2d Cir. 2009) ("Claims for deliberate indifference to a serious medical condition . . . of a person in custody should be analyzed under the same standard irrespective of whether they are brought under the Eighth or Fourteenth Amendment.").

Sistarenik is not entitled to summary judgment on plaintiff's deliberate indifference claim on either prong of the qualified immunity analysis.

## F.   The Dutchess County Sheriff's Office Is Not a Proper Defendant.

Finally, the Dutchess County Sheriff's Office contends that it is not a suable entity. "Under New York law, departments that are merely administrative arms of a municipality do not have a legal identity separate and apart from the municipality and, therefore cannot sue or be sued." *See Davis v. Lynbrook Police Dep't*, 224 F. Supp. 2d 463, 477 (E.D.N.Y. 2002); *see also Sulehria v. City of N.Y.*, 670 F. Supp. 2d 288, 325 (S.D.N.Y. 2009). Plaintiff offers no argument in response. Moreover, as Dutchess County itself remains a defendant in this action, she will not be prejudiced by the

removal of the Sheriff's Office as a named defendant. *See Smith v. Westchester Cnty.*, 769 F. Supp. 2d 448, 455 n.1 (S.D.N.Y. 2011).

The Court therefore dismisses the Dutchess County Sheriff's Office as a defendant.

## IV. CONCLUSION

For the foregoing reasons, the Court hereby:

- grants summary judgment in defendants' favor on plaintiff's claim for false arrest;
- grants the County defendants' motion for judgment on the pleadings on plaintiff's claim for negligent hiring, training, and supervision;
- denies defendants' motion for summary judgment on plaintiff's section 1983 claims and state law claims for assault, battery, and wrongful death; and
- dismisses the Dutchess County Sheriff's Office as a defendant.

Dated:  New York, New York
       August 21, 2014

SO ORDERED:

Sidney H. Stein, U.S.D.J.